# 24-0369-cv

## United States Court of Appeals

*for the*

## Second Circuit

E & T SKYLINE CONSTRUCTION, LLC,

*Plaintiff-Appellant,*

— v. —

TALISMAN CASUALTY INSUARNCE COMPANY, LLC,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX
## FOR PLAINTIFF-APPELLANT

JOSEPH P. ASSELTA
BRET L. MCCABE
FORCHELLI DEEGAN TERRANA LLP
*Attorneys for Plaintiff-Appellant*
The Omni
333 Earle Ovington Boulevard,
    Suite 1010
Uniondale, New York 11553
(516) 248-1700

CP COUNSEL PRESS (800) 4-APPEAL • (328350)

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1, the undersigned counsel for Plaintiff-Appellant in the above-captioned action certifies that the following are corporate parents and/or publicly held corporations owning 10% or more of the stock of Plaintiff-Appellant:  None.

_____

Bret L. McCabe
*Counsel for Plaintiff-Appellant*

Dated: May 22, 2024

# TABLE OF CONTENTS

PRELIMINARY STATEMENT.................................................................1

JURISDICTIONAL STATEMENT ...........................................................2

STATEMENT OF THE ISSUES ................................................................2

STATEMENT OF THE CASE....................................................................3

    A. Factual Background.........................................................................4

        1.  The Subcontract between E&T and NYR................................4

        2.  The Terms and Conditions of the Bond ..................................7

        3.  Performance Under the Subcontract by E&T and NYR...........8

        4.  The March 8, 2019 Letter .....................................................13

        5.  NYR's Continued Deficient Performance .............................14

    B. Procedural History.........................................................................18

        1.  The Complaint and Talisman's Motion(s) to Dismiss ...........18

        2.  Discovery and Cross-Motions for Summary Judgment .........20

        3.  The Trial and the District Court's Denial of Liability ...........21

        4.  E&T's Motion Under FRCP 59(e)........................................23

SUMMARY OF THE ARGUMENT .......................................................24

STANDARD OF REVIEW .....................................................................28

ARGUMENT ..........................................................................................30

I.  The District Court Erred in Ruling that Plaintiff was in
    Default Under the Terms of the Subcontract ...................................30

II.  The District Court Erred in Determining the March 8, 2019 Letter
    Formed a Part of the Subcontract ....................................................36

CONCLUSION .......................................................................................41

# TABLE OF AUTHORITIES

**Cases**                                                         **Page(s)**

*Amaranth LLC v. JPMorgan Chase & Co.,*
2008 N.Y. Slip Op. 33544(U) ...........................................................39

*Atateks Foreign Trade Ltd. V. Private Label Sourcing, LLC,*
402 F. App'x 623, 625 (2d Cir. 2010) ........................................30, 34

*Barleo Homes, Inc., v. Tudomawr Corp.,*
625 N.Y.S.2d 599, 600 (2d Dep't 1995) ............................................32

*Barrows v. Becerra,* 24 F.4th 116 (2d Cir. 2022) ...............................29, 34

*Cellular Telephone Co., v. 210 E. 86th Street Corp.,*
839 N.Y.S.2d 476 (1st Dep't 2007)....................................................31

*Chevron Corp. v. Naranjo,* 667 F.3d 232, 239 (2d Cir. 2012) ...........29, 34

*Crown Wisteria, Inc., v. Cibani,* 115 N.Y.S.3d 264 (1st Dep't 2019) .....31

*Cruden v. Bank of New York,* 957 F.2d 961 (2d Cir. 1992)....................40

*Donohue v. Hochul,* 32 F.4th 200, 206 (2d Cir. 2022).......................29, 34

*Duse v. International Business Machines Corp.,*
252 F.3d 151, 158 (2d Cir. 2001) .......................................................30

*E&T Skyline Construction, LLC v. Talisman Casualty Insurance Company,*
Civil No. 1:19-cv-08069 (November 6, 2023) (Slip Op.) ...................4

*E&T Skyline Construction, LLC v. Talisman Casualty Insurance Company,*
Civil No. 1:19-cv-08069 (January 11, 2024) (Slip Op.)......................4

*Eternity Global Master Fund Ltd., v. Morgan Guar. Trust Co. of N.Y.,*
375 F.3d 168 (2d Cir. 2004) ...............................................................40

*Hamilton Int'l Ltd. V. Vortic, LLC,* 13 F.4th 264, 271 (2d Cir. 2021)......28

*Hammer v. Lumberman's Mut. Cas. Co.,* 214 Conn. 573, 573 A.2d 699 (1990).....40

*Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc.,*
723 F.Supp. 976 (S.D.N.Y. 1989) ......................................................31

*Ingle v. Glamore Motor Sales, Inc.,* 490 N.Y.S.2d 240 (2d Dep't 1985).................32

*Isett v. Aetna Life Ins. Co.*, 947 F.3d 122, 129-30 (2d Cir. 2020) .....................29, 34

*Karabu v. Pension Ben. Guar. Corp.*,
    No. 96 Civ. 4960 (BSJ), 1997 WL 759462 (S.D.N.Y. Dec. 10, 1997) ............32

*Laguerre v. Nat'l Grid USA*, 2022 WL 728819 (2d Cir. Mar. 11, 2022) ...........29, 36

*Ornelas v. US*, 517 U.S. 690, 696-697 (1996) ....................................................29, 34

*Riverside S. Planning Corp., v. CORP/Extell Riverside, L.P.*,
    13 N.Y.3d 398, 892 N.Y.S.2d 303, 920 N.E.2d 359 (2009).............................39

*Shahriar v. Smith & Wollensky Rest. Grp., Inc.*,
    659 F.3d 234, 251 (2d Cir. 2011) ...............................................................29, 36

*Shipping & Finance, Ltd., v. Aneri Jewels LLC*,
    2019 WL 5306979 (S.D.N.Y. Oct. 21, 2019)...................................................40

*State St. Bank & Trust Co.*, 374 F.3d 170 ................................................................31

*Summa v. Hofstra Univ.*, 708 F.3d 115, 123 (2d. Cir. 2013)...................................29

*Sussman Sales Company, Inc., v. VWR International, LLC*,
    2021 WL 1165077.......................................................................................31, 33

*Travelers Cas. And Sur. Co., v. Dormitory Authority-State of New York*,
    (August 11, 2010) 734 F.Supp.2d 368 ............................................................39

*US v. L-3 Commc'ns EOTech, Inc.*, 921 F.3d 11, 18 (2d Cir. 2019) .......................28

*Wholean v. CSEA SEIU Local 2001*, 955 F.3d 332, 334 (2d. Cir. 2020)
    cert. denied, 141 S. Ct. 1735 (2021) ...............................................................29

**Statutes**

28 U.S.C. § 1291 ........................................................................................................2

28 U.S.C. § 1332(a)(1)...............................................................................................2

F.R.C.P...........................................................................................2, 4, 19, 23, 38

## PRELIMINARY STATEMENT

Plaintiff, E&T Skyline Construction, LLC (E&T) is a general contractor performing work within the five boroughs of New York. For a project site located at 31 East 30th Street, Plaintiff retained non-party NY Renaissance Corp. (NYR), as a subcontractor, to furnish and install the windows (and associated window hardware), as well as the terrace doors, and exterior louvers (install only).

By way of a written Subcontract, Plaintiff and NYR agreed upon a price of $1,850,000 for the performance of NYR's work. The terms of the Subcontract also required that NYR procure a Performance Bond in the penal sum of said Subcontract amount, i.e., $1,850,000.

Defendant, Talisman Casualty Insurance Company, as surety for NYR, issued said bond, guaranteeing the full, complete and timely performance of NYR's Subcontract obligations.

Following several instances of default by NYR, Plaintiff issued a formal notice of termination to NYR, and subsequently demanded that Talisman take prompt action under the Performance Bond. However, Talisman denied coverage under the Performance Bond, and Plaintiff then filed suit seeking damages against Talisman for those costs incurred by Plaintiff in completing and correcting NYR's deficient work, which became necessary due to Talisman's default in performing under the bond.

1

After trial, the District Court denied Plaintiff's claim, ruling that Talisman was not liable under the bond.

In so holding, the Honorable Jed S. Rakoff found that Plaintiff itself had defaulted under the Subcontract based solely on a March 8, 2019 letter transmitted by NYR to Plaintiff, the self-serving terms of which the Court improperly concluded formed a part of the Subcontract and mistakenly interpreted to as imposing additional obligations on Plaintiff, without any writing signed by the Plaintiff or any legal consideration being given.

As a result, the District Court erred in finding that Talisman bears no liability to Plaintiff under the Performance Bond.

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction over this action under 28 U.S.C. § 1332(a)(1). This Court has jurisdiction over this appeal under 28 U.S.C. § 1291 because the District Court entered judgement on November 6, 2023, denying the liability of Talisman under the bond (with the District Court adhering to such judgment, by way of its January 11, 2024 ruling on Plaintiff's subsequent 59(e) motion) and Plaintiff then filed a timely notice of appeal on February 9, 2024.

## STATEMENT OF THE ISSUES

1. Whether the District Court erred in denying Plaintiff's claims against Talisman based on its determination that Plaintiff was in default under the terms of

2

the Subcontract, where pursuant to the clear and unambiguous terms of the contract, the obligations of the Plaintiff regarding the conditions of the Project site were solely related to the provision of suitable areas for storage.

2.     Whether the District Court erred in finding that additional obligations were imposed upon Plaintiff by NYR's March 8, 2019 letter and recovery schedule, where no legal consideration was given for same and the terms of the Subcontract specified that a formal modification to the Subcontract required signatures from both parties agreeing to additional Subcontract terms.

3.     Whether the District Court erred in interpreting the language of NYR's March 8, 2019 letter and recovery schedule which simply states that the "upper floors of the site [be made] available for installation" as somehow obligating Plaintiff to make the upper floors free of all obstructions at the time of delivery and storage of windows, where NYR was not even ready to begin installing same without having first completed substantial remedial, preparatory work.

## STATEMENT OF THE CASE

E&T filed suit against Talisman on August 29, 2019, alleging that Talisman improperly and wrongfully denied liability under the Bond, and seeking damages related to the expenses incurred by E&T as a result of NYR's deficient and untimely performance. *See* JA-3, ECF No. 6, Compl. [1]

---

[1] References to the Joint Appendix are designated as "JA-__". Complaint as "Compl."

In response, Talisman filed a Motion to Dismiss under Rule 12(b)(7), which was denied. Thereafter, on October 8, 2020, Talisman filed its Answer. *See* JA-11, ECF No. 84.

Following discovery, and the parties' submission of respective motions for summary judgment (which were also denied), a four-day bench trial was held between April 24, 2023 and April 27, 2023, after which the Honorable Jed S. Rakoff entered judgment in favor of Talisman. *See* JA-18, ECF No. 140, SPA-1 to19 (*E&T Skyline Construction, LLC v. Talisman Casualty Insurance Company*, Civil No. 1:19-cv-08069 (November 6, 2023) (Slip Op.).[2]

E&T then timely moved, pursuant to F.R.C.P. 59(e), on December 4, 2023, seeking to alter Judge Rakoff's judgment, and the District Court denied said motion on January 11, 2024. *See* JA-19, ECF No. 144, SPA-30 to 35, (*E&T Skyline Construction, LLC v. Talisman Casualty Insurance Company*, Civil No. 1:19-cv-08069 (January 11, 2024) (Slip Op.).

E&T then timely appealed.

A.    **Factual Background**

1.    **The Subcontract between E&T and NYR**

On November 17, 2016, Plaintiff-Appellant, E&T Skyline Construction, LLC ("E&T"), as general contractor, entered into a subcontract agreement with non-party

---

[2] The Special Appendix shall be designated as "SPA".

4

NY Renaissance Corp., ("NYR"), under the terms of which, NYR was obligated to supply and install rectangular and custom-shaped windows (as well as all associated window hardware), terrace doors, and exterior louvers (install only), in connection with a construction project located at 31 East 30th Street (the "Project"), for the lump sum price of $1,850,000 (the "Subcontract"). *See* Compl. ¶ 6, JA-706, JA-715 Article 10, JA-749 to 759. Under the terms of the Subcontract, NYR agreed to furnish all labor, materials and other equipment necessary to effectuate its scope of work. *Id*.

Additionally, under the Subcontract, any work performed by NYR deemed to be deficient (and/or defective) was required to be replaced and/or re-executed, without additional cost to E&T. *See* JA-727 ¶ 4.5.3. NYR was also required to complete all of its Project work, within 28 weeks of its commencement date. *See* JA-784.

Under the terms of the Subcontract, E&T was obligated to provide suitable areas for storage of NYR's materials and equipment during the course of NYR's performance of its scope. In turn, NYR was obligated to coordinate the location of such storage areas with all other trades or subcontractors working at the Project. In the event such coordinated storage areas required relocation, NYR would be entitled to reimbursement for any of its costs related to such relocation. *See* JA-708 § 3.1.2, JA-725 to 726 ¶ 4.1.13. NYR expressly agreed that it had accepted the Project

conditions related to site access, as well as any requirement to temporarily remove the Project fence and barriers (if necessary) for the facilitation of its deliveries and performance of its window work. *See* JA-756, line 62.

These storage, coordination and performance obligations were never altered, amended nor modified.

In this vein, the Subcontract terms and conditions state that the agreement between the parties may only be amended by a Modification, defined within the AIA A201 (incorporated into the Subcontract by reference) as: "(1) a written amendment to the contract signed by both parties, (2) a Change Order, (3) a Construction Change Directive, or (4) a written order for a minor change in the Work issued by the Architect." *See* JA-707 § 1.3, JA-708 Article 2, *See* § 1.1.1 and 1.1.2 of AIA A201.[3]

To ensure the full, complete and timely performance of NYR's Project obligations, the Subcontract also specified that NYR procure a Performance Bond, written with a penal sum of the total Subcontract value, specifically, $1,850,000. *See* JA-759 line 107. E&T issued a change order to NYR on February 2, 2017, to pay for the amount of the Bond premium, $64,750, and accordingly, on February 7, 2017, Defendant-Appellee, Talisman Casualty Insurance Company, LLC ("Talisman") issued said Performance Bond (the "Bond"). *See* JA-807, JA-808 to 811.

---

[3] This Court should take Judicial Notice of the terms of the AIA A201- General Conditions of the Contract, as such provisions are incorporated into the Subcontract by reference, and the accuracy of such cannot be the subject of dispute.

## 2.     The Terms and Conditions of the Bond

As part of the conditions of the Bond, Talisman's obligations would arise upon the occurrence of: (1) E&T providing notice to Talisman that it is considering declaring NYR in default under the Subcontract; (2) E&T actually declaring NYR to be in default, terminating the Subcontract (and providing timely notice to Talisman of same); and (3) E&T's agreement to pay the balance of the Subcontract price to Talisman (or a contractor it selects) for the completion of the Project. *See* JA-809 § 3.

Following E&T's satisfaction of the foregoing, and provided E&T was not itself in default of the Subcontract, Talisman's obligations were to: (1) promptly arrange for NYR to perform and complete the Subcontract; or (2) undertake to complete the Subcontract itself; or (3) timely obtain bids and arrange for a different contractor to complete the Subcontract; or (4) pay to E&T the costs and expenses for E&T to complete the Subcontract. *Id*., *See* also § 5.

The Bond defines an NYR default as: "Failure of the Contractor, which has not been remedied or waived, to perform or otherwise to comply with a material term of the Construction Contract." *Id*., at § 14.3.

Default of E&T under the Bond is defined as: "Failure of the Owner, which has not been remedied or waived, to pay the Contractor as required under the

7

Construction Contract or to perform and complete or comply with the other material terms of the Construction Contract." *Id*., at § 14.4. [4]

The Bond also includes an "Additional Obligee Rider" (which is deemed controlling in the event of a conflict involving Bond terms) which specifies that E&T shall perform "all other obligations to be performed under the [Sub]Contract in all material respects at the time and in the manner therein set forth such that no material default by [E&T] shall have occurred and be continuing under the [Sub]Contract." *See* JA-817.

### 3.     Performance Under the Subcontract by E&T and NYR

Commencing in or around June of 2017, E&T placed NYR on notice of several instances of default, as related to: (i) NYR's billing practices; (ii) NYR's untimely performance; and (iii) NYR's improper and unilateral suspension of its scope of work. *See* JA-822 to 827.

By way of Letter, dated August 22, 2017, E&T informed Talisman of NYR's improper suspension of production on the Project windows, and further advised that NYR had been submitting invoices for materials that had not yet been fully approved by the Project's design team. *See* JA-827 to 828.

---

[4] For clarification, the Bond states that in the event the Bond is issued pursuant to an agreement between a Contractor and Subcontractor (as is the case here) the term Contractor shall be deemed to refer to Subcontractor, and the term Owner shall be deemed to refer to Contractor. *Id.*, at § 15

Thereafter, E&T and NYR exchanged correspondence wherein each party levied accusations against the other, with Talisman copied on all such transmittals. *See* JA-829 to 840.

On October 24, 2017 E&T advised NYR that the Project was sustaining several delays based on NYR's deficient performance and failure to initiate the performance of the waterproofing portion of its scope. The E&T notice stated that NYR would be held responsible for all such delays, and that mobilization was demanded to minimize the overall impact of such. *See* JA-840.

The parties then attempted to resolve said dispute, and by way of Letter Agreement dated November 27, 2017, NYR agreed to continue fabrication and delivery of the Project windows, and E&T agreed to place Project monies into escrow for NYR's benefit. *See* JA-842 to 845.

Contrary to the later March 8, 2019 NYR Letter (as discussed further below), the November 27, 2017 Letter Agreement, in compliance with the requirements governing a Subcontract Modification, was executed by both E&T and NYR, and specifically stated that the terms and conditions contained therein would serve to modify and amend the Subcontract. *Id.*

Moreover, the November 27, 2017 Letter Agreement also specified that each party agreed to and acknowledged the obligations as dictated therein. *Id.*

9

Subsequently, between the periods of March and July, 2018, an independent testing agency retained to perform inspections of NYR's work, Indus Architects PLLC ("Indus"), discovered numerous defects related thereto, including failed water tests, improper and inconsistent sealing at the windows, improperly installed exterior flashing, improper shim placement, and a general failure to perform field measurements of the window openings by NYR. *See* JA-856 to 865, JA-872 to 877. Additional deficiencies were again identified by Indus during the months of September and October, 2018, and there were concerns regarding whether the windows, as installed by NYR, would prove watertight. *See* JA-878 to 879, JA-881 to 885, JA-884 to 905.

E&T also advised NYR that NYR consistently failed to attend regular Project coordination meetings, and that overall, NYR was failing to provide sufficient manpower to adequately and timely perform its obligations under the Subcontract. *See* JA-866 to 867.

In response, NYR had alleged that its supplier, Giugiaro Architectural & Structures ("Giugiaro"), for whom it was responsible, had improperly and untimely performed. *See* JA-911 to 916.

In an e-mail between NYR and Giugiaro, on January 24, 2019, NYR admitted that the rectangular windows fabricated by Giugiaro and installed by NYR were defective and NYR agreed that "Giugiaro fabricated and delivered to port of NY

approximately 333 defective windows…"). *See* JA-911.

Additionally, according to NYR's Subcontract schedule and based on the date it commenced the installation of windows at the project, the custom windows from Giugiaro should have arrived on site before September 2018. *See* JA-784.

However, as of February 1, 2019, the custom windows had still not been delivered.

In fact, on February 1, 2019, NYR issued a Notice of Default to its manufacturer, Giugiaro. This notice stated, inter alia, that "…delivery of the custom triangular windows is already late by no less than 14 weeks…" and that "…to NYR's dismay it has also come to our attention that Giugiaro has yet to procure the material for these custom shape windows which it explicitly claimed to have been procured in 2017…" *See* JA-917 to 920, JA-213 line 13 through JA-214 line 20. (emphasis added).

Giugiaro contacted E&T following the February 1, 2019 NYR notice, and referenced a payment dispute between Giugiaro and NYR. *See* JA-211 line 21 through JA-212 line 7, JA-212 lines 17-18, JA-217 lines 11-20.

On February 6, 2019, E&T demanded a plan of action from NYR to address the issues surrounding the window work; expressed that E&T was at the time "gravely concerned"; demanded that NYR minimize any further Project delays and

damages; and advised NYR that any related costs incurred would be NYR's responsibility. *See* JA-921 to 922.

In response, NYR issued a letter to Plaintiff dated February 8, 2019, wherein NYR asserted that a plan of action would be forthcoming; that delay damage claims "…could only be determined at the conclusion of the Project…"; and that "…NYR would never pay for material that it could not prove was actually procured, which is in fact the case here…" *See* JA-1440 to 1442.

NYR formally terminated Giugiaro, by way of letter dated February 8, 2019; and simultaneously furnished a Letter of Intent to a replacement fabricator, namely Metal-Ser Srl. *See* JA-56 line 15 through JA-57 line 8, JA-923 to 925.

Simultaneously, throughout February and early March of 2019, E&T again informed NYR that it was apparent the window work could not be adequately performed by NYR; that NYR did not have the means nor the resources to complete its scope of work; that NYR's change in supplier triggered warranty concerns; and that the previously identified deficiencies had not been adequately addressed. *See* JA-921 to 922, JA-926 to 934.

The foregoing notices were also conveyed simultaneously by E&T to Talisman. *See* JA-928 to 929.

As stated within the various E&T notices, the window issues were gravely impacting the Project schedule, had resulted in numerous cost overruns and

damages, and that temporary windows were required to minimize the impact resulting therefrom. *See* JA-921 to 922, JA-926 to 934.

Thus, E&T requested a teleconference with Talisman to discuss the Project, and E&T's fears related to the continuous deficient performance of NYR, as the failure of NYR to properly coordinate the timely performance of its supplier, and the resulting failure to timely deliver the Project's custom windows was grounds for termination under the Subcontract. *See* JA-929, JA-933.

### 4. The March 8, 2019 NYR Letter

As NYR was undeniably in breach of the Subcontract with respect to its late fabrication and delivery of the custom-shaped windows to the Project (and their subsequent installation), on March 6, 2019, E&T advised NYR and Talisman that a recovery schedule was required to address the fabrication and delivery delays sustained to date, to initiate installation of temporary window protection at the custom window openings, and to repair the previously identified deficiencies in the windows which had been installed. *See* JA-933.

Thereafter, on March 8, 2019, NYR provided E&T with a proposed recovery schedule pertaining to the aforementioned issues, representing that the Project delivery of the initial order of custom-shaped windows would occur during the period between April 29, 2019 and May 5, 2019, and that installation would also commence simultaneous with such. *See* JA-935 to 936.

The March 8, 2019 NYR letter also represented that the completion of NYR's entire custom-window scope would occur by June 2, 2019. *Id.*

However, said recovery schedule, although presented on NYR Letterhead, bore no signature whatsoever and was not executed by a representative of NYR nor by anyone from E&T. In fact, the March 8, 2019 Letter contains no signature block at all, does not include any reference to the preparer's name, title, contact information, or any other form of identification regarding the author or sender. *Id.*

Therefore, the March 8, 2019 Letter and recovery schedule did not constitute a formal change to the Subcontract, but was merely NYR's attempt at minimizing further damage to E&T resulting from NYR's untimely and continued improper performance. *See* JA-224 line 7 through line 23.

Indeed, as stated hereinabove, it is uncontroverted that the Subcontract specifies that any modification must be in writing, <u>executed by both parties</u>. (emphasis added) *See* JA-747 § 16.1.5. [5]

### 5. NYR's Continued Deficient Performance

Following NYR's transmission of its proposed recovery schedule, additional window deficiencies were again identified, including, by way of example, incomplete installation of the window flashing, improperly installed framing, as well as issues related to the window receptors. These issues were detailed by the third-

---

[5] This requirement also appears within Section 1.1.2 of the AIA A201.

14

party inspection agency, Indus, and within its March 18, 2019 report, it was identified that twenty-four (24) out of twenty-seven (27) rectangular window units were deemed unacceptable, requiring some form of remediation by NYR. *See* JA-956 to 1013.

On April 19, 2019, an inspection by Indus again identified several window deficiencies (as related to the application of the Elemax membrane), and noted that remedial measures may have been inappropriately implemented in an "…attempt at improving performance of tested window, which would not apply to general window installation…" leading to Indus' recommendation that "…The test must indicate the true state of the installed windows, <u>undoctored</u>…" (emphasis added). *See* JA-1019 to 1033.

The initial delivery of the custom windows did not occur between April 29, 2019 and May 5, 2019 as promised by NYR in the recovery schedule it had unilaterally issued on March 8. Moreover, on May 21, 2019, Indus identified that NYR's installation of the receptors for the custom windows was in progress and noted several deficiencies related to said receptor installation. *See* JA-1034 to 1043.

As a result, by way of Letter, dated June 10, 2019, E&T placed NYR on notice of its continued default and demanded that NYR correct said improper and untimely performance, and that NYR provide E&T with the payment requirements of the window suppliers (to ensure the immediate shipment of the Project's custom

15

windows) as further delays would exacerbate any already incurred Project damages. *See* JA-1044 to 1045.

Despite such notice and demands, however, NYR's breaches persisted, and on June 18, 2019, Indus prepared and transmitted a memorandum, denoting that NYR had improperly installed window receptors prior to the receipt by Indus (and the project architect) of a full set of shop drawings. *See* JA-1078 to 1091. On June 25, June 27, July 9, and July 11, 2019, Plaintiff again contacted NYR, via email, inquiring as to the status of the required cure of said deficiencies, as well as, requesting a status update on the custom window delivery (and their anticipated arrival date to the Project). *See* JA-1093, JA-1100 to 1101.

NYR did not respond to any of E&T's status inquiries of June 25, June 27, July 9 or July 11, 2019 as related to the estimated delivery date of the custom windows.

Despite such continued demand for information, E&T had discovered that the custom windows were in fact delivered to port on June 28, 2019; that NYR had taken possession of said windows and was holding them in an undisclosed location rather than delivering them to the Project; and that NYR had refused to deliver them. *See* JA-1099, JA-691 line 10 through JA-694 line 19. E&T then informed NYR and Talisman as much, demanding that the windows be immediately delivered to the Project. *See* JA-1099, JA-1102.

16

It is uncontroverted that NYR never even attempted delivery of the custom windows, despite the foregoing demands.

Accordingly, on July 15, 2019, E&T transmitted a "Final Notice of Default" and "Opportunity to Cure" to NYR (with Talisman copied) referencing the prior June 10, 2019 Notice of Default, and again citing NYR's refusal to deliver the custom windows; a failure to adequately staff the Project; a failure to remit payment to material suppliers and subcontractors; and NYR's improper invoicing of work. *See* JA-1106.

No cure was effectuated by NYR as related thereto (with NYR continuing to refuse even to disclose the location of the custom-shaped windows it had allegedly finally received), and on July 19, 2019, E&T transmitted to NYR, and copied Talisman, a formal Notice of Termination, citing the prior June 10, 2019 and July 15, 2019 Notice(s) of Default, and demanding that all windows in the possession of NYR be delivered to the Project site. [6] *See* JA-1208.

Separately, on July 19, 2019, E&T also transmitted independent notice to Talisman (denoting the termination of NYR as principal under the bond); wherein E&T agreed to pay the balance of the Subcontract price to Talisman; and E&T demanded that Talisman take prompt action under the terms of the Bond. *See* JA-1209 to 1210.

---

[6] To date, the subject windows have never been delivered to the Project.

17

However, following a series of email exchanges, as well as requests and transmittals of further information between E&T and Talisman, on August 21, 2019, Talisman responded to E&T that it had no obligation under the performance bond "…because of Owner Default…" *See* JA-1211 to 1214, JA-1220 to 1221, JA-1308 to 1313.

### B. Procedural History

#### 1. The Complaint and Talisman's Motion(s) to Dismiss

E&T filed suit against Talisman on August 29, 2019, alleging that Talisman improperly and wrongfully denied liability under the Bond, and seeking damages related to the expenses incurred by E&T as a result of NYR's deficient and untimely performance. *See* JA-3, ECF No. 6, Compl.

Within its Complaint, E&T alleged that it had fully, satisfactorily, and timely performed all of its obligations under the Subcontract, and that NYR had materially breached its obligations by, *inter alia*, failing to meet deadlines, failing to provide Project progress updates, failing to supply an adequate number of skilled workers, failing to properly remit payment to its suppliers, and failing to deliver the Project windows. Compl. ¶'s 9 and 10.

E&T also averred in its Complaint that it had complied with the pertinent requirements under the Performance Bond, in that Talisman was timely placed on notice of NYR's default, that NYR failed to adequately cure its default and was

therefore properly terminated, and that E&T timely advised Talisman of the foregoing. Thus, despite the fact that Talisman was obligated to take action under the Performance Bond, it refused, and therefore, E&T was seeking damages related thereto. Compl. ¶'s 11 through 20.

In response, on September 19, 2019, Talisman, via counsel, submitted a Pre-Motion Letter to Judge Analisa Torres advising that Talisman sought to bring a Motion to Dismiss under Rule 12(b)(7) (failure to join a necessary party), with Judge Torres then ordering a briefing schedule related thereto. *See* JA-4, ECF Nos. 12, 14. Accordingly, on October 24, 2019, Talisman filed its Motion to Dismiss under Rule 12(b)(7), and the motion was considered fully briefed by both parties on November 22, 2019. *See* JA-4, ECF Nos. 18-24.

On July 30, 2020, Magistrate Judge Netburn issued a report and recommendation recommending denial of Talisman's motions for dismissal, (to which Talisman objected) and by way of Order entered by Judge Torres on September 30, 2020, the report and recommendations were adopted, thereby terminating the Talisman motions for dismissal. *See* JA-10 to 11, ECF Nos. 71, 78, 79 and 83.[7]

---

[7] Talisman separately raised a jurisdictional challenge within a second Motion to Dismiss, and Magistrate Judge Netburn's R&R included an authorization for targeted discovery (as related to the corporate operations and incorporation details of Talisman). Magistrate Judge Netburn's R&R specifically allowed for renewal of Talisman's jurisdictional challenge, in the event Talisman chose to renew such.

Thereafter, on October 8, 2020, Talisman filed its Answer. *See* JA-11, ECF No. 84.

### 2. Discovery and Cross-Motions for Summary Judgement

Following discovery, between March 17, 2021 and June 1, 2021, the parties filed respective cross-motions for summary judgment, inclusive of their respective supporting documents, opposition(s) and reply briefs. *See* JA-12 to 15, ECF No. 94 through 115.

E&T moved for summary judgment on the issue of liability only (seeking a trial on damages) and Talisman cross-moved for summary judgment renewing its challenge that the District Court lacked jurisdiction over the action.

The District Court entered its Order related thereto on March 2, 2022. *See* JA-15, ECF No. 116.

As a threshold matter, the District Court decided the Talisman jurisdictional question prior to deciding the Plaintiff's motion. *Id*. In its ruling, the Court acknowledged that Talisman presented alternative theories of its jurisdictional challenge, namely, statelessness and participants as members.

However, the District Court found neither argument persuasive, finding that Talisman was a citizen of Louisiana (in complete diversity with the Plaintiff who was deemed a citizen of New York and New Jersey); and further finding that

Talisman's participants are not its members for the purposes of diversity jurisdiction. As such, the District Court denied Talisman's motion to dismiss. *Id*.

Regarding E&T's motion seeking summary judgment on Talisman's liability, the Honorable Analisa Torres similarly denied E&T's motion, finding that disputes of material facts precluded summary judgment, ruling that an issue of fact existed regarding whether E&T provided adequate and safe spaces for NYR's material storage. *Id*.

Accordingly, the District Court issued a Final Pretrial Scheduling Order on March 3, 2022 and the action was eventually set for Trial, with a commencement date of April 24, 2023.

### 3. The Trial and the District Court's Denial of Liability

The Honorable Jed S. Rakoff presided over the trial, commencing on April 24, 2023, and continuing through April 27, 2023. Each party presented their respective evidence and witnesses, including principals from both E&T and NYR; as well as a representative from the third-party consulting firm, Indus; and an individual identified as NYR's former Project Manager.

On November 6, 2023, the District Court rendered its Findings of Fact and Conclusion of Law, and entered judgment in favor of Talisman. *See* SPA-1 to 19, ECF No. 140.

Judge Rakoff's decision was largely based on a finding that E&T had accepted the March 8, 2019 recovery schedule as a modification to the Subcontract, and that the schedule imposed an obligation onto E&T regarding the upper floors of the Project. *See* SPA-3, lines 11-12, ECF No. 139. Despite the fact that the March 8, 2019 Letter was not even signed as accepted by E&T (nor would it be, as NYR was already in breach of the Subcontract and was simply trying to mitigate the damages it was causing), the decision states that the March 8, 2019 Letter formed a part of the Subcontract, and that the obligations stated therein were conditions imposed upon E&T requiring compliance. *See* SPA-16 to 17, ECF No. 139.

Judge Rakoff's ruling found that E&T's failure to comply with the terms unilaterally set forth by NYR in its March 8, 2019 Letter (recovery schedule) rose to the level of default on the part of E&T, thereby eliminating Talisman's liability under the Performance Bond. *See* SPA-18, ECF No. 139.

Within the ruling, Judge Rakoff states: "There is also no dispute that the terms of the March 8, 2019 revised schedule form part of the subcontract." *See* SPA-16, ECF NO. 139.

Contrary to the foregoing, neither E&T's nor Talisman's proposed findings of fact and conclusions of law, refer to the Letter as forming a part of the Subcontract. E&T's submission references the March 8, 2019 letter as either a "proposed recovery

22

schedule" "schedule" or "letter". Talisman's submission merely refers to such as a "requested recovery schedule". *See* JA-18, ECF No. 135 and 136.

Judge Rakoff's decision concludes that since E&T did not argue that the condition(s) within the March 8, 2019 Letter do not form a material term of the Subcontract, (*See* SPA-17, ECF No. 139), then, as a result, the District Court was imposing the obligations of the March 8, 2019 Letter upon E&T. But the District Court misinterprets the relevant language in the March 8, 2019 Letter which simply states that the "upper floors of the site [be made] available for installation" and instead finds that E&T was now obligated to provide the upper floors free of obstructions so that NYR could deliver and store (rather than install) the windows on those floors, despite the fact that due to its own defective work, the windows were not ready to be installed in those areas. Notwithstanding the foregoing, Judge Rakoff held that E&T failed to comply with this newly created, not agreed to obligation, and was accordingly in default of the Subcontract

Based on its ruling regarding liability, Judge Rakoff did not address any of the arguments proffered by E&T regarding the value of its damages.

### 4.    E&T's Motion Under FRCP 59(e)

On December 4, 2023, E&T moved, pursuant to FRCP 59(e), seeking to reverse/alter the Judgment.

In its argument seeking reversal of the November 6, 2023 judgment, E&T asserted that Judge Rakoff erred in concluding that the March 8, 2019 Letter formed a part of the Subcontract, and that E&T in fact complied with its contractual obligations in that suitable areas for delivery and storage were provided to NYR. *See* JA-19, ECF No. 141, 143-144.

Talisman filed opposition to E&T's motion on December 21, 2023. *See* JA-19, ECF No. 142.

On January 11, 2024, Judge Rakoff issued a ruling, stating that the District Court would not consider E&T's argument that the terms of the recovery schedule were not part of the Subcontract, as E&T should have raised such within its post-trial proposed findings of fact and conclusions of law, despite the fact that Talisman itself did not even argue that said recovery schedule was a modification of the Subcontract terms or attempt to prove same. *See* JA-19, ECF No. 144.

## SUMMARY OF THE ARGUMENT

Pursuant to the District Court's ruling, E&T was barred from obtaining damages under the Performance Bond on the basis that E&T failed to comply with the terms and conditions contained within the unsigned March 8, 2019 NYR Letter. The District Court found that E&T had not provided the upper floors of the Project available for installation, and therefore, E&T was in default of the obligations under said letter, thereby negating any liability of Talisman under the bond.

The foregoing determination is, however, flawed in several regards.

It is uncontroverted that NYR was required to both deliver and install the windows at the Project pursuant to the contract schedule.  E&T, admittedly, was obligated pursuant to the Subcontract to provide suitable areas for the storage of the windows upon their delivery (if necessary) prior to their installation.[8]  There is no requirement as to the exact location for said storage.

In this vein, E&T provided and maintained the exterior hoist at the Project in order to distribute the windows from any storage location at the site to the floors where they would ultimately be installed.  Additionally, E&T also converted the interior passenger car at the Project to be utilized for the distribution of the windows to their appropriate floors.  Notwithstanding E&T's obligations to provide suitable storage locations, however, it was incumbent upon NYR to coordinate its deliveries and storage requirements with all other trades performing work at the Project, and to arrange the appropriate means for the routing of its materials.

The late delivery of the custom windows by NYR did not alter E&T's obligations as related thereto.

---

[8] It is uncontroverted that NYR had to prepare the window openings prior to the commencement of its installation operations (e.g., placement of receptors, sealant, waterproofing, etc.).

25

The March 8, 2019 recovery schedule from NYR makes no reference whatsoever to the E&T storage obligations and simply states that the "upper floors of the site [be made] available for installation". *See* JA-935 to 936.

However, the District Court misinterpreted this document, in that (i) Judge Rakoff read the language as if it applied to E&T's storage obligations (which is not supported by the clear and unambiguous language solely referencing installation) and (ii) then incorrectly found the misinterpreted language from the unsigned Letter to be binding upon E&T.

While it was disputed as to whether the upper floors contained any obstructions at the time of the arrival of the windows at port, Judge Rakoff ultimately credited the testimony of NYR as related thereto. But, E&T never had an obligation to provide the upper floors free from obstructions for the temporary storage of the windows (as opposed to at the time of their installation) and E&T proved that ample storage was available for the windows at the Project's lower floors.

It is also undisputed that NYR never even attempted to deliver the custom windows to the Project site.

Moreover, the reports prepared by the independent third-party inspection agency highlighted that contemporaneous installation would not have even been possible had NYR actually delivered the windows to the site as NYR had improperly cobbled together the window receptors, necessitating their complete removal and

26

replacement. Therefore, there was no need to even attempt to store them at the upper floors. *See* JA-450 line 2 through line 23, JA-1224 to 1243.

Nevertheless, regardless of the actual meaning of the language in the document, the District Court erred in denying E&T's claims under the Bond because the March 8, 2019 Letter itself did not form a part of the Subcontract, and, therefore, the terms and conditions stated therein did not impose any binding obligation upon E&T.

Furthermore, the District Court's conclusion that E&T never challenged the March 8, 2019 Letter as forming a part of the Subcontract is not supported by the evidence or the law. Neither NYR nor Talisman proffered that the March 8, 2019 recovery schedule constituted a formal Modification to the Subcontract, and the terms and conditions of the Subcontract expressly articulate the requirements for a formal Modification, none of which were met.

Thus, E&T possessed no burden to challenge the March 8, 2019 Letter, as the clear and unambiguous terms of the Subcontract specified the requirements governing modification and/or amendment of the parties' obligations, and the Letter failed to meet those requirements.

Moreover, even if the March 8, 2019 Letter did bind E&T, the clear language of same did <u>not</u> require that E&T provide the upper floors of the Project clear of obstructions for the delivery and storage of the windows. Instead, the language

pertained to the availability of the upper floors at the time of "installation" of the windows. And the District Court erred in overlooking the evidence (including from non-party consultant, Indus) that the upper floors were not even ready for installation of the windows at the time the windows were scheduled for their belated delivery, as NYR had improperly installed the custom-window receptors, and Indus had recommended that each and every receptor required removal and replacement prior to installation. *See* JA-450 line 2 through line 23, JA-1224 to 1243.

It defies all logic that E&T, which repeatedly demanded that NYR finally deliver all custom windows for which E&T had previously paid NYR and which were holding up the timely construction of the Project, was somehow asking NYR to deliver the windows to a site that had no room available for storage anywhere. To the contrary, it was NYR, who was already in breach of its contractual obligations, that was looking for any excuse to frustrate the delivery of the windows.

For these reasons, this Court should reverse the District Court's judgment, vacate its ruling denying Talisman's liability under the Performance Bond, and remand this action back to the District Court for an inquest on E&T's damages.

## STANDARD OF REVIEW

This Court reviews questions of law in regard to contract interpretation *de novo*. (*Hamilton Int'l Ltd. v. Vortic LLC*, 13 F.4th 264, 271 (2d Cir. 2021); *US v. L-3 Commc'ns EOTech, Inc.*, 921 F.3d 11, 18, (2d Cir. 2019); *see also*, (*Donohue v.*

*Hochul*, 32 F.4th 200, 206 (2d Cir. 2022)). In so doing, this Court reviews the issues as if the lower court had not decided the matter. *See, e.g.*, *Wholean v. CSEA SEIU Local 2001*, 955 F.3d 332, 334 (2d Cir. 2020), cert. denied, 141 S. Ct. 1735 (2021); *Summa v. Hofstra Univ.*, 708 F.3d 115, 123 (2d Cir. 2013)). Accordingly, the District Court's finding that the March 8, 2019 Letter formed a part of the Subcontract shall be reviewed by this Court without deference to the prior ruling. (*Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 251 (2d Cir. 2011); *see also Laguerre v. Nat'l Grid USA*, 2022 WL 728819, at *1 (2d Cir. Mar. 11, 2022) (summary order)).

Regarding interpretation of the Subcontract (and the related analysis on the conditions of the Project and/or suitable storage areas) this Court should consider such a mixed question of law and fact, and review *de novo* as well. *Donohue v. Hochul*, 32 F.4th 200, 206 (2d Cir. 2022) (Contract interpretation questions of law reviewed *de novo*); *Ornelas v. US*, 517 U.S. 690, 696-697 (1996) (mixed question of law and fact exists when the question before the court concerns whether a rule of law as applied to a set of established facts is or is not violated; *see also Isett v. Aetna Life Ins. Co.*, 947 F.3d 122, 129-30 (2d Cir. 2020) (usually, the Second Circuit reviews mixed questions of law and fact under a *de novo* standard of review), see also, *Barrows v. Becerra*, 24 F.4th 116, at 135 (2d Cir. 2022); (*Chevron Corp. v. Naranjo*, 667 F.3d 232, 239 (2d Cir. 2012) (an appellate court uses the *de novo*

standard of review when reviewing a lower court's conclusions of law; (*Atateks Foreign Trade Ltd. v. Private Label Sourcing, LLC*, 402 F. App'x 623, 625 (2d Cir. 2010)* (an appellate court generally reviews mixed questions of law and fact under a *de novo* standard of review.

## ARGUMENT

## I.  The District Court Erred in Ruling that Plaintiff was in Default Under the Terms of the Subcontract

E&T's contractual obligations with respect to NYR's ability to mobilize its equipment and/or materials are solely established under the clear and unambiguous terms of the Subcontract and are limited to the provision of suitable areas for storage. *See* JA-708 § 3.1.2.  It is noteworthy that there are no specific areas for storage on the Project site called out in the Subcontract.

Therefore, any analysis of E&T's performance must rely upon the terms contained within the four corners of the Subcontract (and incorporated Rider). *Duse v. International Business Machines Corp.*, 252 F.3d 151, 158 (2d Cir.2001) ("If the court determines that "the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms").

However, the District Court ruled that E&T was in default under the Subcontract by not providing NYR with the upper floors of the Project available for installation, notwithstanding (i) the absence of any such requirement existing within the Subcontract and (ii) the fact that NYR was not even ready to install the windows

in the upper floors.

Thus, the District Court erred in its interpretation of the Subcontract, acting contrary to well established law providing that the terms set forth within the Subcontract shall govern the parties' performance. *State St. Bank & Trust Co.,* 374 F.3d at 170. ("a court cannot imply a covenant inconsistent with the terms expressly set forth in the [Sub]contract, and a court cannot …supply additional terms for which the parties did not bargain. (*Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc.,* 723 F.Supp. 976, 991–93 (S.D.N.Y.1989).

The Subcontract merely required that E&T provide suitable areas for storage on the site, without specifying that custom-shaped windows had to be stored on the upper floors of the building.

Despite such fact, however, the District Court imposed upon E&T additional obligations which simply did not exist under the Subcontract.

The District Court's imposition of such obligations constitutes an error. *Sussman Sales Company, Inc. v. VWR International, LLC*, United States District Court, S.D. New York, March 26, 2021, 2021 WL 1165077. ("New York courts generally discern parties' intent through the plain language of the agreement"), *Crown Wisteria, Inc.* v. *Cibani,* 115 N.Y.S.3d 264, 264 (1st Dep't 2019), *Cellular Telephone Co.* v. *210 E. 86th Street Corp.*, 839 N.Y.S.2d 476, 480 (1st Dep't 2007). *Sussman Sales Company, Inc. v. VWR International, LLC* ("Put

somewhat differently, where the parties negotiated specific requirements and obligations at the time they entered into the Agreement, the Court will not belatedly impose additional requirements. The Court cannot rewrite the Agreement where Plaintiff failed to negotiate for the requirements that it now deems vital to the Agreement's purpose.") *See Karabu* v. *Pension Ben. Guar. Corp.*, No. 96 Civ. 4960 (BSJ), 1997 WL 759462, at *14 (S.D.N.Y. Dec. 10, 1997) ("Where, as here, sophisticated parties negotiate at arm's length, the Court cannot and should not rewrite the contract — no matter how poorly drafted — to include language or rights that a party itself was unable to insert."); *Barleo Homes, Inc.* v. *Tudomawr Corp.*, 625 N.Y.S.2d 599, 600 (2d Dep't 1995) ("A court may not rewrite into a contract conditions the parties did not insert, or under the guise of construction, add or excise terms." (citation and internal quotation marks omitted)); *Ingle* v. *Glamore Motor Sales, Inc.*, 490 N.Y.S.2d 240, 242 (2d Dep't 1985) ("It is fundamental that courts enforce contracts and do not rewrite them."

Therefore, the District Court's finding of default on the part of E&T, based on the imposition of an obligation which never existed, was clear error in regard to a question of law and the interpretation of the Subcontract.

E&T was simply obligated to provide suitable areas for the storage of NYR's materials at the project site – there was no requirement, for instance, that custom windows had to be stored on the upper floors. The Subcontract terms and conditions

are clear in this regard. The Project, a 42-story newly constructed building, contained over 90,000 square feet of unoccupied space. *See* JA-252 line 8 through 15, JA-820 to 821. Thus, the Project would accommodate safe and suitable storage of the windows on any number of the building's 42 floors. In fact, testimony at trial confirmed that the lower floors of the Project had been utilized for the storage of the rectangular windows, without any issues, and therefore, the custom windows could have been placed at the lower floors as well. *See* JA-330 line 18 through JA-332 line 3.

It is uncontroverted that E&T repeatedly demanded that NYR arrange for delivery of the windows to the Project. *See* JA-1009 to 1102, JA-1106, JA-1117. In fact, following NYR's termination, E&T advised Talisman on August 9, 2019 that E&T would even receive and distribute the windows to the pertinent floors, and that NYR simply needed to bring the windows to the Project. *See* JA-1222. This belies any argument that there was insufficient or inadequate space on site to store the windows.

Indeed, E&T's maintenance of the Project hoist and interior elevator car were extended for the sole purpose of effectuating such safe delivery and storage. *See* JA-1093, JA-1221. Surely, E&T would not consistently have demanded the delivery of the windows had it not been feasible to ensure their safe storage. Moreover, it is uncontroverted NYR never even attempted delivery of the custom windows.

33

In fact, NYR took possession of the windows, secreted them in an undisclosed location, and failed to notify E&T of their arrival at port until E&T independently discovered that they had arrived within the United States.

Thus, regarding interpretation of the Subcontract, and the related analysis concerning conditions of the Project (and the availability of suitable storage areas), this Court should review the issues stated herein without deference to the Honorable Jed S. Rakoff's decision or conclusions. *Donohue v. Hochul*, 32 F.4th 200, 206 (2d Cir. 2022) (contract interpretation questions of law reviewed *de novo*); *Ornelas v. US*, 517 U.S. 690, 696-697 (1996) (mixed question of law and fact exists when the question before the court concerns whether a rule of law as applied to a set of established facts is or is not violated; *see also Isett v. Aetna Life Ins. Co.*, 947 F.3d 122, 129-30 (2d Cir. 2020); *Barrows v. Becerra*, 24 F.4th 116, at 135 (2d Cir. 2022) (usually, the Second Circuit reviews mixed questions of law and fact under a *de novo* standard of review); (*Chevron Corp. v. Naranjo*, 667 F.3d 232, 239 (2d Cir. 2012) (an appellate court uses the *de novo* standard of review when reviewing a lower court's conclusions of law; (*Atateks Foreign Trade Ltd. v. Private Label Sourcing, LLC*, 402 F. App'x 623, 625 (2d Cir. 2010) (an appellate court generally reviews mixed questions of law and fact under a *de novo* standard of review.

It is uncontroverted that the crux of NYR's concerns related to the conditions of the Project site (and allegations regarding "obstructions") were limited to Floors

34

33 through 39 of the Project, and were solely related to the ability to perform the installation of the custom windows at such "upper" floors. *See* SPA-3 ¶ 12, ECF No. 139; JA-568 line 5 through 13.

Yet, NYR was not even ready to install the custom windows at the upper floors and it was established that there was plenty of storage space available for those windows throughout the interior of the building, specifically the lower floors. *See* JA-252 line 8 through 15, JA-330 line 18 through JA-332 line 3, JA-820 to 821.

In fact, NYR never tried to show that delivery of the windows and storage on the lower floors would be impossible.

Actually, the evidence and testimony established specifically that E&T: (i) provided 32 lower floors of unobstructed space to accommodate delivery and storage of the windows; (ii) provided a construction hoist to allow for receipt and distribution; (iii) provided an interior elevator service car - which had been approved for use as a material hoist; (iv) provided an accessible loading dock; (v) employed numerous laborers to assist in material movement and distribution; and (vi) actually remitted direct payment for the windows to the manufacturer. *See* JA-317 line 5-12, JA-326 line 1-23, JA-331 line 21-25, JA-1046, JA-1048, JA-1100, JA-1221.

Moreover, the District Court appears to have ignored the fact that NYR never even attempted delivery, and that to date, the windows have still never been provided to E&T (despite the incontrovertible fact that E&T paid directly for them).

Consequently, the interpretation of the Subcontract provisions, and the compliance of E&T therewith, constitutes a question of law for this Court's *de novo* review

## II. The District Court Erred in Determining the March 8, 2019 Letter Formed a Part of the Subcontract

As stated heretofore, in holding that E&T was in default under the Subcontract, the District Court relied upon the NYR March 8, 2019 NYR Letter (recovery schedule) to impose an obligation upon E&T that the upper floors of the Project be made available for installation. *See* SPA-16 to 17, ECF No. 139.

This finding, predicated upon the District Court's determination that the terms of the March 8, 2019 revised schedule formed a part of the Subcontract (and its corresponding misinterpretation of the language at issue), was made in error.

The conditions of the Subcontract are clear and unambiguous in terms of amendments and/or modifications, and the District Court's interpretation of the contractual language (and the effect of the March 8 Letter as related thereto) constitute a question of law for this Court's *de novo* review.

Consequently, this Court should offer no deference to the District Court when performing the instant evaluation of the pertinent Subcontract terms. *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 251 (2d Cir. 2011); see also *Laguerre v. Nat'l Grid USA*, 2022 WL 728819, at *1 (2d Cir. Mar. 11, 2022).

36

The terms of the subcontract state that any modification must be in writing, executed by both parties. *See* JA-747 ¶ 16.1.5.

The March 8, 2019 Letter does not comply with such requirement and therefore, did not undisputedly "form part of the subcontract".

In fact, the March 8, 2019 Letter is not executed by either party, contains no signature block whatsoever, and while it may be on NYR letterhead, it does not contain any information at all related to its author.

As such, the Letter cannot possibly be construed as part of the Subcontract. (As stated heretofore, Section 16.1.5 of the Rider specifically states that the agreement cannot be amended or modified, except in writing, executed by E&T and NYR). *See* JA-747.

Moreover, Section 1.3 of the Subcontract reiterates that the Subcontract may be modified only by a Modification, with Section 1.1.1 of the AIA A201 specifically defining Modification as: "(1) a written amendment to the contract signed by both parties, (2) a Change Order, (3) a Construction Change Directive, or (4) a written order for a minor change in the Work issued by the Architect." *See* JA-707 § 1.3 (incorporation of the AIA Document A201 by reference)

Contrast the foregoing March 8, 2019 Letter with the parties' November 27, 2017 Letter Agreement, which was in compliance with the requirements governing a Subcontract Modification, as it was executed by both E&T and NYR and

37

specifically stated that the terms and conditions contained therein would serve to modify and amend the Subcontract. *See* JA-842 to 845. Moreover, the November 17, 2017 Letter Agreement explicitly stated that the parties "Agreed to and Acknowledged" its terms. *Id.* As such, E&T and NYR were both aware as to how to properly amend or modify the Subcontract and did so in November 2017. Since the March 8, 2019 was not intended as a modification to the Subcontract, they did not follow the same procedures with respect to it. (Of note, the March 8, 2019 Letter did not even contain a signature block). *See* JA-935 to 936.

Thus, the District Court's conclusion that the terms of the March 8, 2019 were undisputed (and formed a part of the Subcontract) was in error and triggers *de novo* review by this Court.

Neither the testimony presented during the bench trial, nor the evidence here, supports the District Court's determination. In fact, the testimony of Kevin Tolbert further clarified that the March 8, 2019 recovery schedule "was definitely not an extension of time". *See* JA-224 line 14 through 20.

Mr. Tolbert further testified: "This is to minimize damages. So what is – OK. You already failed to meet the schedule. Give me a revised recovery schedule and how you are going to minimize the damages or delays." *See* JA-224 line 21 through 23.

Notwithstanding such, the District Court failed to even consider E&T's

38

argument within its 59(e) motion, instead finding that E&T "could have raised" this contention within its initial post-trial brief. But, again, that overlooks the fact that Talisman itself did not even argue that the Letter modified or became part of the Subcontract.

Therefore, any reference by the District Court that the Letter became an undisputed "part of the subcontract" constitutes an error upon which the District Court's finding is based.

As this Court is aware, it is a well-established principle that "[A] court should not adopt an interpretation which will operate to leave a provision of a contract without force and effect." *Amaranth LLC v J.P. Morgan Chase & Co.*, 2008 NY Slip Op 33544(U). Furthermore, it has been articulated "Courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." *Riverside S. Planning Corp. v. CORP/Extell Riverside, L.P.,* 13 N.Y.3d 398, 404, 892 N.Y.S.2d 303, 920 N.E.2d 359 (2009)*; Travelers Cas. and Sur. Co. v. Dormitory Authority-State of New York* (August 11, 2010) 734 F.Supp.2d 368.

Indeed, the District Court's decision does not find that Talisman demonstrated the March 8, 2019 Letter formed a part of the Subcontract (in fact, Talisman did not even argue for such). Thus, while the District Court states that E&T failed to rebut such, it overlooked Talisman's burden of even attempting to proffer such position in

the first place.

The District Court was required to stay within the four corners of the Subcontract here. *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.* 375 F.3d 168, 177 (2d Cir. 2004) ("[T]he best evidence of intent is the contract itself; if an agreement is 'complete, clear and unambiguous on its face [, it] must be enforced according to the plain meaning of its terms.").

Accordingly, the District Court may not "rewrite, under the guise of interpretation," the plain terms of the Subcontract to impose some never-bargained for performance or obligation upon E&T. *Cruden v. Bank of New York,* 957 F.2d 961, 976 (2d Cir. 1992).

Here, the Subcontract is explicit regarding the scope of the obligations of E&T and NYR. The March 8, 2019 Letter (recovery schedule) certainly does not change such. *Shipping & Finance, Ltd. v. Aneri Jewels LLC*, 2019 WL 5306979, at *3 (S.D.N.Y. Oct. 21, 2019) (where "the contract is clear and unambiguous on its face, the intent of the parties must be gleaned from within the four corners of the instrument, and not from extrinsic evidence"). *Hammer v. Lumberman's Mut. Cas. Co.,* 214 Conn. 573, 583, 573 A.2d 699 (1990) ("the language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning, and courts cannot indulge in a forced construction ignoring provisions or so distorting them as to accord a meaning other than that evidently intended by the

40

parties.").

Notwithstanding such, however, the District Court ignored the requirements within the Subcontract as related to modifications, and instead surmised, absent any supporting evidence or even any argument for same by Talisman, that the March 8, 2019 Letter amended the parties' obligations.

Therefore, the District Court's finding that "[t]here is also no dispute that the terms of the March 8, 2019 revised schedule form part of the [S]ubcontract" is clear error requiring this Court's *de novo* review and reversal.

## CONCLUSION

For the foregoing reasons, the judgment of the District Court should be reversed, Talisman should be deemed liable under the Performance Bond, and an inquest on damages should be set.

Respectfully submitted,

_____

Bret L. McCabe
Joseph P. Asselta
FORCHELLI DEEGAN TERRANA, LLP
333 Earle Ovington Boulevard, Suite # 1010
Uniondale, New York 11553
(516) 248-1700
*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION, TYPEFACE
## REQUIREMENTS AND TYPE STYLE REQUIREMENTS

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a) and Local Rule 32.1(a). This brief contains 9,305 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief complies with the typeface requirements of Fed. R. App. P. (a)(5)(A) and type style requirement of Fed. R. App. P. 32(a)(6) as it has been prepared in 14-point Times New Roman font (using the 2013 version of Microsoft Word) and a proportionally spaced typeface.

_____
Bret L. McCabe
*Counsel for Plaintiff-Appellant*


Dated: May 22, 2024

SPECIAL APPENDIX

i

# TABLE OF CONTENTS

**Page**

Findings of Facts and Conclusions of Law of the
United States District Court for the Southern
District of New York, dated November 6, 2023 ....   SPA-1

Judgment of the United States District Court for the
Southern District of New York, dated November
6, 2023, Appealed From.........................................   SPA-19

Order of the United States District Court for the
Southern District of New York, dated January 11,
2024, Appealed From.............................................   SPA-30

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| E & T SKYLINE CONSTRUCTION, LLC, | 19-cv-8069 (JSR) |
|     Plaintiff, | FINDINGS OF FACT AND CONCLUSIONS OF LAW |
|     -v- | |
| TALISMAN CASUALTY INSURANCE COMPANY, LLC, | |
|     Defendant. | |

JED S. RAKOFF, U.S.D.J.:

This case concerns a construction dispute about the installation of custom windows, imported from Italy, at a luxury condominium building in Manhattan. Plaintiff E & T Skyline Construction, LLC ("E&T"), the general contractor responsible for the building's construction, hired subcontractor NY Renaissance Corp. ("NYR") to deliver and install the windows. To cover its losses in case NYR failed to perform, E&T obtained a performance bond of $1,850,000 from defendant Talisman Casualty Insurance Company, LLC ("Talisman"). As it turned out, E&T terminated NYR for default and came knocking to Talisman to pay the bond. Talisman refused, pointing to E&T's own failure to fulfill each of its obligations under the bond agreement, which was a precondition for Talisman's payment. E&T sued Talisman for breach of the bond agreement, and the Court held a four-day bench trial. The Court now holds that Talisman is not liable, and sets forth the following findings of fact and conclusions of law.

I.   Findings of Fact

SPA-2

Based on the parties' joint statement of facts, exhibits, deposition designations, and -- critically -- the trial testimony and the Court's assessment of the witnesses' demeanor and credibility, the Court makes the following factual findings:

1.   E&T was the general contractor of a project (the "Project") to construct a 40-story condominium building located at 30 East 31st Street in Manhattan. Tr. 6, 25.[1]

2.   On November 17, 2016, E&T entered into a subcontract with NYR to deliver and install rectangular windows and custom triangle-shaped windows, along with related materials, at 30 East 31st Street. ECF No. 125 ("Joint Statement of Facts"), at 2; PX 1 ("Subcontract").[2]

3.   This dispute involves the custom windows, which NYR was to install on floors 33 through 40. Tr. 13.

4.   On February 7, 2017, Talisman issued to E&T a performance bond of $1,850,000 for NYR's work on the Project, with NYR as the principal and Talisman as the surety. PX 4 ("Bond Agreement").

5.   The Bond Agreement provides that Talisman's "obligation under this Bond" arises "[i]f there is no Owner Default." Bond Agreement § 3.

6.   The Bond Agreement defines "Owner Default" as "[f]ailure of the Owner . . . to pay the Contractor as required under the

_____

[1] Citations to "Tr." refer to the trial transcript.

[2] Citations to "PX" refer to plaintiff's trial exhibits; citations to "DX" refer to defendant's trial exhibits.

Construction Contract or to perform and complete or comply with the other material terms of the Construction Contract." Id. § 14.4.

7.   Because the "Bond [was] issued for an agreement between a Contractor and subcontractor, the term Contractor" in the Bond Agreement "shall be deemed to be Subcontractor and the term Owner shall be deemed to be Contractor." Id. § 15; Tr. 211.

8.   The subcontract between E&T and NYR included a rider with additional terms and various schedules laying out the scope of work. Subcontract.

9.   Although the subcontract initially listed a completion date of January 17, 2018 for NYR's work, it would not have been possible for NYR to complete its work by then because the building's concrete superstructure -- the responsibility of a separate subcontractor with no involvement by NYR -- had not been fully erected. Tr. 175-77.

10.   The building's concrete superstructure was not complete until "May or June of 2018." Tr. 177.

11.   On March 8, 2019, E&T accepted a revised schedule that NYR proposed. Tr. 208, 368-69; DX 8 ("Revised Schedule").

12.   The revised schedule accepted by E&T, which listed June 2, 2019 as the end date for "finalizing the installation" of the custom windows, stated that the schedule was "subject to . . . the Owner providing the upper floors of the site available for installation (free of current debris and protrusions into the window openings)." Revised Schedule at 1.

SPA-4

13.  In NYR's letter proposing the revised schedule, "NYR request[ed] that the Owner . . . compel[] its contractors to remove debris from the upper floors and otherwise make installation possible including by removing the protrusions currently in place." Id. at 1-2.

14.  E&T understood the letter's reference to "the Owner" to refer to E&T as the Project's general contractor. Tr. 211.

15.  On April 16, 2019, Nick Carranza of NYR sent an email to Kevin Tolbert of E&T, and others, stating, "[T]here is no way to install windows even if they were onsite today. There are openings that still need framing which have nothing to do with our windows." DX 9 at 1.

16.  In another email sent on the same day, also from Nick Carranza to Kevin Tolbert and others, Carranza described "numerous obstructions throughout floors 33-39 preventing NYR from putting in windows." Id. at 2. "Just to give one example," the email stated, "the outriggers for the scaffolding on [the] 35th floor is [sic] preventing any installation of windows in this location and will continue to do so until the scaffolding is removed." Id.

17.  That email attached a "Custom Shape Window Onsite Conditions Report" that Carranza had prepared. Id. at 4. The report states that its purpose is "to illustrate the onsite conditions of floors 33-39 where the custom shape windows are to be installed." Id. The report contained pictures and written descriptions of impediments to

installation of those windows on each of floors 33 to 39. Id. at 4-13.

18.   According to the report, windows could not be installed on the 39th floor because of "steel beams protruding from the window openings," around which there was "no way to maneuver." Id. at 4.

19.   According to the report, windows could not be installed on the 38th floor because of "metal panels piled throughout the floor which need to be removed in order to start work." Id.

20.   According to the report, windows could not be installed on the 37th floor because, on the south elevation of the building, "there [was] plywood blocking the openings and the hoist anchor/support [was] coming through the window opening." Id. at 5. On the north elevation of the 37th floor, to which NYR did have access, NYR had "started to waterproof openings" for the windows. Id.

21.   According to the report, windows could not be installed on the 36th floor because, on the north elevation, "there [were] piles of drywall and framing on the ground in front of the window openings," and on the south elevation, "there [were] steel beams dispersed on the floor as well as plywood in front of the openings . . . preventing access to these windows." Id.

22.   According to the report, windows could not be installed on the 35th floor because of "various suspended scaffolding outriggers protruding from the window openings." Id.

SPA-6

23.   According to the report, windows could not be installed on the 34th floor because of "steel beam supports as well as a shanty in front of the window openings." Id. at 5-6.

24.   According to the report, windows could not be installed on the south elevation of the 33rd floor because of "piles of metal framing lying on the floor in front of the window openings that need to be moved . . . prior to installation." Id. at 6. NYR had begun waterproofing window openings on those parts of the floor that it could access. Id.

25.   The photographs attached to the report corroborated the written descriptions. Id. at 7-13.

26.   On May 20, 2019, Mario Lisman, a senior project manager at NYR, sent an email to Kevin Tolbert of E&T, and others, detailing numerous impediments to NYR's ability to install the custom windows. DX 10. Among them, Lisman referred to "countless emails sent to E&T" about "[c]learing each level to access the openings." Id.

27.   On May 24, 2019, NYR sent Kevin Tolbert a letter about delays to the revised schedule. DX 11. The letter noted "that there are still many areas that NYR does not have access to install custom shape receptors."[3] Id. at 2. "In fact, on May 23, 2019 [NYR was] directed by E&T to only . . . work on floors 36 and 37 due to other trade materials on the other floors." Id. "In addition," the letter continued, "NYR

_____

[3] A receptor is framing for a window around the perimeter of the opening, which provides additional stability and is installed before the window itself. Tr. 44-45.

has been unable to install receptors on 38, 35, and 34 due to materials on the floors and/or protrusions in the window openings." Id.

28.   The same letter stated that although "the Project is not yet ready for the install[ation] of the custom shaped windows, the custom shaped windows have been released to the transport company." Id. The letter attached an invoice and transport documents from earlier that month showing that numerous windows were being shipped from Italy to New York, with an ultimate destination of 30 East 31st Street. Id. at 3-6.

29.   On June 10, 2019, E&T sent NYR a Notice of Default and Opportunity to Cure, for, among other things, failing to meet the revised schedule. PX 53; Tr. 56-57.

30.   NYR responded by letter to Kevin Tolbert on June 13, 2019. DX 16. NYR wrote that "there has been no NYR failure, just a failure to provide NYR with sufficient access, properly sized concrete openings, among other continuing Project issues." Id. The letter continued that NYR had provided E&T with "shipping documents and photos of completed windows," had "verbally informed [E&T] of the progress of the custom windows," and had sent NYR "an interim Sea Way Bill." Id. The interim Sea Way Bill included a shipping list and tracking number for the custom windows. Tr. 389.

31.   In late June and early July 2019, Kevin Tolbert followed up with NYR by email about the status of the windows. DX 18. Tolbert had learned that the windows had come into port on June 28, 2019. Id.

SPA-8

32.  On July 12, 2019, Mario Lisman of NYR responded that "there are many obstructions onsite that will not allow NYR to deliver the windows in an expeditious manner as we plan to do." Id. As a result, rather than deliver the windows to the site, "NYR took the extra measure to receive and store the shipment to prevent the windows from being damaged and took the initiative to incur additional charges to store the material in a controlled environment." Id.

33. Lisman's July 12, 2019 response included a link to photographs Lisman took that same day, showing that "the floors are not free and clear of debris and materials to perform any installation and store materials needed to complete any installation." Id.

34.  The same day, which was a Friday, Monique DeLacroix, the president of NYR, sent an email to Kevin Tolbert and others stating that "[o]n Monday," NYR would "arrange to walk the site with [E&T's superintendent] in order to clear the path for us to install the windows directly in the openings." DX 19.

35.  On the following Monday, however, July 15, 2019, E&T sent NYR a Final Notice of Default and Opportunity to Cure, again citing NYR's failure to meet the revised schedule and related problems. PX 64.

36.  On July 16, 2019, Dan Pirvulescu of NYR sent an email to various people at E&T, including Kevin Tolbert, stating, "It is amazing how every time we have asked to walk[] the building we were denied." DX 21.

37.   NYR sent another letter to E&T on July 18, 2019, in response to the Final Notice of Default. DX 22. The letter stated that "all the alleged defaults have already been cured" except for the delayed delivery of the custom windows. Id. at 1. "Just prior to E&T's recent notice," the letter continued, "on July 12, 2019, NYR again communicated to E&T that there were (a) obstructions in the window openings preventing NYR's work to install the windows and (b) materials and other items strewn about on floors 33-39 preventing the delivery of the windows from the hoist and also storage of those windows on the floors." Id. "Moreover, on July 15th, NYR was again on the Project site and documented the material obstructions in the path of the hoist and on the floors preventing delivery, storage and installation of the custom shaped windows." Id. at 2.

38.   NYR's July 18, 2019 letter stressed "that NYR has the custom shaped windows in storage and NYR is ready, willing and able to deliver and install the custom windows to the Project." Id. "NYR placed the windows in storage as there is obviously no room for storage on the Project site" and "NYR is currently being prevented from performing by E&T." Id.

39.   The July 18, 2019 letter also explained that NYR had been able to, and did, install receptors for 46 of the 82 custom window openings. Id. "On the other hand, there are 36 window openings where NYR is prevented from installing the receptors due to the hoist and/or scaffolding outriggers being located in the openings." Id.

40.  The July 18, 2019 letter further explained that "NYR was able to perform the receptor work since the receptors are not bulky/heavy and could be installed by working around the material obstructions still located on those floors." Id. "NYR [was] unable to do the same with the windows since they are in one piece (glass and frame), are very bulky and heavy, and require no less than four men to move each window from the hoist, onto the floor and then to manipulate it in to the opening." Id.

41.  On July 19, 2019, E&T responded with a Notice of Termination of NYR's employment on the Project. PX 73. The notice stated that NYR "continue[d] to remain in default of [its] contractual obligations" because NYR "failed to deliver all windows to the project site." Id. Accordingly, NYR and its employees were "no longer permitted on the Project site." Id.

42.  When asked at trial about E&T's reason for terminating NYR, Kevin Tolbert responded only about NYR's failure to timely deliver the custom windows. Tr. 154-55.

43.  E&T sent a copy of the Notice of Termination to Talisman. PX 73.

44.  On July 24, 2019, Talisman sent a "Claim Inquiry Letter" to E&T seeking documentation about the value of the claim and compliance with the terms of the subcontract and the Bond Agreement. PX 75.

45.  E&T sent the requested documents to Talisman on August 5, 2019. PX 78. The same day, Kevin Tolbert sent a follow-up email on

behalf of E&T to Talisman, demanding that Talisman "perform its obligations under the Bond." PX 77.

46.   Talisman suggested that E&T and NYR meet to "work out the differences on the site conditions." ECF No. 126 ("Foster Dep."), at 107.[4] The result, however, "was no discussion" because Kevin Tolbert of E&T "refused to meet." Id. As a result, Talisman came to the "conclusion . . . that [E&T] didn't want the windows." Id. Indeed, based on Talisman's own review of the letters and emails that had been exchanged between E&T and NYR, Talisman believed that numerous of Tolbert's statements "were untrue." Id. at 107-08.

47.   On August 21, 2019, Talisman sent a letter to E&T stating that it "has no obligation under [the Bond Agreement] because the Owner is in default under the Construction Contract." PX 83. In particular, Talisman concluded, "[t]he actions of the Owner prevented the Principal from being able [to] perform its work under the Construction Contract." Id. The letter listed numerous aspects of E&T's apparent default, but relevant here is that although NYR "placed [E&T] on notice that it could not deliver materials until there was assurance the materials would not be damaged," "[t]he unclean, inaccessible, unorganized, and dangerous conditions of the worksite subject the windows, if delivered, and workers, to damage and injury." Id. Attached as exhibits to the letter are numerous photos showing

_____

    [4] The deposition of John Foster, vice president of Talisman, was designated and received in evidence, save for portions to which the Court sustained objections.

construction equipment and miscellaneous bulky items strewn across the floor in various parts of the upper floors of the building, obstructing access to the window openings. Id.

48. At trial, the Court heard testimony from numerous witnesses whom the Court found fully credible corroborating the contemporaneous photographs, emails, and letters that showed construction debris, materials, and other items clogging routes of access to, and spaces directly in front of, the openings for the custom windows.

49. For instance, the Court credits the testimony of Nicholas Carranza, who was the controller of NYR with some project management responsibilities from May 2017 to January 2020 but is no longer employed there. Carranza visited the Project site consistently from February to July 2019. Tr. 489-90.

50. Carranza described that in February 2019, the floors on which the custom windows were to be installed -- the "upper floors" of the building -- contained "stacks of panels all over," "metal studs and framing for the . . . carpenter," and "miscellaneous materials, whether it's plywood, they had gypsum board, the green gypsum board installation . . . stored on the upper floors." Tr. 491.

51. According to Carranza, in March 2019 "[n]othing really changed" and the upper floors of the building were marked by "[v]ery similar conditions." Tr. 491.

52. According to Carranza, in April 2019, the upper floors again had "[v]ery similar conditions," in addition to "rigging materials

that were basically all over the floors holding the scaffolding in place." Tr. 491-92.

53.  According to Carranza, May 2019 was more of the "[s]ame conditions" on the upper floors. Tr. 492.

54.  According to Carranza, his observations in June 2019 showed the "[s]ame thing" on the upper floors -- "still the piles of the metal framing, the panels for the exterior work was still up there." Id. "The scaffolding [was] still up there." Id. "There was also steel tubing being stored on the roof on those floors as well." Id.

55.  Finally, according to Carranza, he saw "[s]till very similar conditions" in July 2019. Id. "The panels, the framing, the scaffolding was still up, everything was basically the same." Id. at 492-93.

56.  Dan Pirvulescu, NYR's technical director who appeared under subpoena and had been at the Project site daily in spring 2019, testified similarly and credibly. Pirvulescu explained that the custom windows were up to 10 feet in height and the majority of those windows had a base of 5 feet or more. Tr. 333-34. Indeed, Kevin Tolbert of E&T corroborated that "[a]ll the windows were floor to floor height," stretching "from slab to ceiling," which "was 10 feet." Tr. 323-24. The custom windows weighed hundreds of pounds each. Tr. 367.

57.  In the late spring of 2019, E&T specifically instructed NYR not to work on certain floors between 33 and 39 "because of materials stored in such areas." Tr. 388.

58.  Pirvulescu testified that, within a few days of the custom windows' arrival to port in June 2019, NYR photographed the Project

site and "asked Mr. Tolbert to walk with us to give us space where to store his windows." Tr. 360. Pirvulescu then walked the site with E&T staff, observing at the time that "[t]here was a lot of debris." Tr. 361. "There was a lot of other materials in the way." Id. "There was barely room for a person to walk." Id.

59.   Although Pirvulescu told E&T staff during that walkthrough that the obstructions prevented installation of the windows, E&T staff responded that "[t]here was nothing they could do" because "[t]here was no space." Tr. 362.

60.   Pirvulescu was at the Project site on July 18, 2019, the day before E&T sent NYR its Notice of Termination. Pirvulescu once again observed that obstructions prevented NYR from even delivering the custom windows to the site. Tr. 393-94.

61.   Pirvulescu testified that he spoke with E&T's site safety manager "[o]n a daily basis . . . about site conditions that need to be addressed." Tr. 395. The site safety manager merely told Pirvulescu to raise the issue with Tolbert. Id.

62.   The testimony of one of E&T's own witnesses, Oran Revivo, a third-party architect hired by E&T to perform an inspection and prepare a report of the Project, supported NYR's account. Tr. 263-64. Revivo's report from a June 19, 2019 visit to the Project site stated that "floors 34, 35, 37, 38, and 39 all have construction materials in place . . . at the north side of the building that prevented Mr. Revivo from properly inspecting certain openings and openings that were not completed on the south side." Tr. 277-79. Revivo formally recommended

in the report that "all obstructing equipment and/or construction materials should be moved prior to inspection." Tr. 279.

63.  Although Kevin Tolbert testified that debris and obstructions did not impede NYR's ability to install the custom windows, the Court finds Tolbert's assertion not to be credible in light of the contemporaneous photographic and documentary evidence and the credible testimony of other witnesses to the contrary.

64.  Indeed, the Court does not believe that NYR would have had an incentive to pay for storage of the windows, as it did on its own dime, rather than deliver the windows to the Project site, if such delivery were feasible. The Court credits the testimony of Nicholas Carranza and Dan Pirvulescu that NYR only did so because the Project site could not accommodate the windows. As Pirvulescu explained, at the time NYR was terminated, "it was absolutely impossible to deliver any windows to that project site due to other materials and other debris and other things that were all over the floors, in the hallways, in front of window openings." Tr. 474. "The material would have got damaged." Id.

65.  Nor did NYR have an incentive to keep the windows for other use or resale, because the windows' design, shape, and size were custom for the Project. Tr. 474-75, 480-82.

**II.  Conclusions of Law**

The governing law is rather straightforward and is not in dispute. "As courts have done for over a century," the Court "look[s] to standard principles of contract interpretation to determine the rights

and obligations of a surety under a bond." U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co., 369 F.3d 34, 51 (2d Cir. 2004). "One of those principles is that, before a surety's obligations under a bond can mature, the obligee must comply with any conditions precedent." Id. "A condition precedent is an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises." Id.

Under the plain terms of the Bond Agreement, Talisman's obligations as surety "shall arise" only "[i]f there is no Owner Default under the Construction Contract." Bond Agreement § 3. Because Talisman's bond was "issued for an agreement between a Contractor and subcontractor, the term Contractor shall be deemed to be Subcontractor and the term Owner shall be deemed to be Contractor." Id. § 15. In other words, the Bond Agreement specifically provided that Talisman had no bond obligations to E&T if E&T itself defaulted under its subcontract with NYR. And the Bond Agreement defined such a default to include a failure "to perform and complete or comply with the other material terms of the" subcontract. Id. § 14.4. Indeed, E&T agrees in its proposed conclusions of law that "Section 3 of the Performance Bond issued by Defendant, as surety, and NYR, as principal pursuant to the Subcontract expressly provides that Defendant's obligations under the Performance Bond arise upon the following: (1) there is no default by Plaintiff." ECF No. 136, at 29-30.

There is also no dispute that the terms of the March 8, 2019 revised schedule form part of the subcontract. The revised schedule

states in no uncertain terms that it is "subject to . . . the Owner providing the upper floors of the site available for installation (free of current debris and protrusions into the window openings)." Revised Schedule at 1. Rather than argue that any failure to comply with that condition would not be an "Owner Default" under the Bond Agreement or that the condition was not a material term of the subcontract, E&T instead contends, as a factual matter, that it "indeed provided suitable areas at the Project site to store NYR's materials and equipment and did not hinder or obstruct NYR's ability to deliver the custom windows to the Project." ECF No. 136, at 31.

As the above findings of fact make clear, however, the Court rejects E&T's factual assertion. The Court concludes that because E&T failed to make the upper floors of the Project site -- floors 33 to 40, where the custom windows were to be installed -- available for installation by clearing those floors of debris and obstructions, E&T was in default of its obligations under the subcontract. And because the lack of any default by E&T was a condition precedent to Talisman's obligations under the Bond Agreement, Talisman held no such obligations and is not liable.

E&T's only counterargument that is legal, not factual, is that Talisman did not sufficiently prove the defense of impossibility. E&T argues that even if some construction debris or obstructing items made it more difficult for NYR to install the windows, Talisman has not shown that the installation was objectively impossible or that the impediments to installation were unforeseeable. But E&T's invocation

of the affirmative defense of impossibility is inapposite. The Court's conclusion of law is not that any affirmative defense bars liability, but that the elements of E&T's cause of action are not satisfied because Talisman's obligations under the Bond Agreement were not triggered.

The terms of the revised schedule -- which, again, both parties agree is incorporated into the subcontract -- required E&T to provide "the upper floors of the site available for installation." Revised Schedule at 1. Lest there be any ambiguity, the agreement further specified what that meant: E&T was required to make those floors "free of current debris and protrusions into the window openings." Id. The Court has found that E&T did not do so.

Because the Court concludes that Talisman is not liable, the Court does not address E&T's arguments about damages. The Clerk is respectfully directed to enter final judgment for defendant Talisman and to close this case.

SO ORDERED.

New York, NY
November 6, 2023

JED S. RAKOFF, U.S.D.J.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X
E & T SKYLINE CONSTRUCTION, LLC,

                          Plaintiff,                    19 **CIVIL** 8069 (JSR)

          -against-                                      **JUDGMENT**

TALISMAN CASUALTY INSURANCE
COMPANY, LLC,

                          Defendants.
-----------------------------------------------------------------X

        It is hereby **ORDERED, ADJUDGED AND DECREED:**  That for the reasons

stated in the Court's Finding of fact and conclusions of law dated November 06, 2023, the court

concludes that Talisman is not liable, the Court does not address E & T's arguments about

damages. The judgment is hereby entered in favor of Talisman Casualty Insurance Company,

LLC; accordingly, the case is closed.

**Dated:**  New York, New York
            November 06, 2023

                                              **RUBY J. KRAJICK**
                                         _____
                                              **Clerk of Court**

                          BY:  _____
                                              **Deputy Clerk**

SPA-20



**United States District Court**
**Southern District of New York**

Ruby J. Krajick
*Clerk of Court*

Dear Litigant:

Enclosed is a copy of the judgment entered in your case. If you disagree with a judgment or final order of the district court, you may appeal to the United States Court of Appeals for the Second Circuit. To start this process, file a "Notice of Appeal" with this Court's Pro Se Intake Unit.

You must file your notice of appeal in this Court within 30 days after the judgment or order that you wish to appeal is entered on the Court's docket, or, if the United States or its officer or agency is a party, within 60 days after entry of the judgment or order. If you are unable to file your notice of appeal within the required time, you may make a motion for extension of time, but you must do so within 60 days from the date of entry of the judgment, or within 90 days if the United States or its officer or agency is a party, and you must show excusable neglect or good cause for your inability to file the notice of appeal by the deadline.

Please note that the notice of appeal is a *one-page* document containing your name, a description of the final order or judgment (or part thereof) being appealed, and the name of the court to which the appeal is taken (the Second Circuit) – *it does not* include your reasons or grounds for the appeal. Once your appeal is processed by the district court, your notice of appeal will be sent to the Court of Appeals and a Court of Appeals docket number will be assigned to your case. At that point, all further questions regarding your appeal must be directed to that court.

The filing fee for a notice of appeal is $505 payable in cash, by bank check, certified check, or money order, to "Clerk of Court, S.D.N.Y." *No personal checks are accepted.* If you are unable to pay the $505 filing fee, complete the "Motion to Proceed *in Forma Pauperis* on Appeal" form and submit it with your notice of appeal to the Pro Se Intake Unit. If the district court denies your motion to proceed *in forma pauperis* on appeal, or has certified under 28 U.S.C. § 1915(a)(3) that an appeal would not be taken in good faith, you may file a motion in the Court of Appeals for leave to appeal *in forma pauperis*, but you must do so within 30 days after service of the district court order that stated that you could not proceed *in forma pauperis* on appeal.

For additional issues regarding the time for filing a notice of appeal, see Federal Rule of Appellate Procedure 4(a). There are many other steps to beginning and proceeding with your appeal, but they are governed by the rules of the Second Circuit Court of Appeals and the Federal Rules of Appellate Procedure. For more information, visit the Second Circuit Court of Appeals website at **http://www.ca2.uscourts.gov/**.

THE DANIEL PATRICK MOYNIHAN
UNITED STATES COURTHOUSE
500 PEARL STREET
NEW YORK, NY 10007-1312

THE CHARLES L. BRIEANT, JR.
UNITED STATES COURTHOUSE
300 QUARROPAS STREET
WHITE PLAINS, NY 10601-4150

Rev. 5/23/14

SPA-21

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

_____

_____

(List the full name(s) of the plaintiff(s)/petitioner(s).)

-against-

_____

_____

(List the full name(s) of the defendant(s)/respondent(s).)

_____CV_____ (     )(     )

**NOTICE OF APPEAL**

Notice is hereby given that the following parties: _____

_____

(list the names of all parties who are filing an appeal)

in the above-named case appeal to the United States Court of Appeals for the Second Circuit

from the    ☐ judgment    ☐ order    entered on: _____

(date that judgment or order was entered on docket)

that: _____

_____

(If the appeal is from an order, provide a brief description above of the decision in the order.)

_____          _____

Dated                                                          Signature*

_____

Name (Last, First, MI)

_____

Address                          City                    State                    Zip Code

_____          _____

Telephone Number                                      E-mail Address (if available)

_____

* Each party filing the appeal must date and sign the Notice of Appeal and provide his or her mailing address and telephone number, EXCEPT that a signer of a pro se notice of appeal may sign for his or her spouse and minor children if they are parties to the case.  Fed. R. App. P. 3(c)(2).  Attach additional sheets of paper as necessary.

Rev. 12/23/13

SPA-22

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

_____

_____          _____CV_____ (      )(      )
(List the full name(s) of the plaintiff(s)/petitioner(s).)

-against-                                          **MOTION FOR EXTENSION
                                                   OF TIME TO FILE NOTICE
                                                   OF APPEAL**
_____

_____
(List the full name(s) of the defendant(s)/respondent(s).)


I move under Rule 4(a)(5) of the Federal Rules of Appellate Procedure for an extension of time

to file a notice of appeal in this action. I would like to appeal the judgment

entered in this action on _____ but did not file a notice of appeal within the required
                            date

time period because:

_____

_____

_____
(Explain here the excusable neglect or good cause that led to your failure to file a timely notice of appeal.)


_____          _____
Dated:                                     Signature

_____
Name (Last, First, MI)

_____          _____
Address                  City              State              Zip Code

_____          _____
Telephone Number                           E-mail Address (if available)


Rev. 3/27/15

SPA-23

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

_____

_____

(List the full name(s) of the plaintiff(s)/petitioner(s).)

-against-

_____

_____

(List the full name(s) of the defendant(s)/respondent(s).)

_____CV_____ (      )(      )

**MOTION FOR LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL**

I move under Federal Rule of Appellate Procedure 24(a)(1) for leave to proceed *in forma pauperis* on appeal. This motion is supported by the attached affidavit.

_____

Dated

_____

Name (Last, First, MI)

_____

Address                    City

_____

Telephone Number

_____

Signature

_____

_____

State                    Zip Code

_____

E-mail Address (if available)

Rev. 12/23/13

SPA-24

## Application to Appeal In Forma Pauperis

_____**v.** _____   Appeal No. _____

District Court or Agency No. _____

| **Affidavit in Support of Motion** | **Instructions** |
|---|---|
| I swear or affirm under penalty of perjury that, because of my poverty, I cannot prepay the docket fees of my appeal or post a bond for them. I believe I am entitled to redress. I swear or affirm under penalty of perjury under United States laws that my answers on this form are true and correct. (28 U.S.C. § 1746; 18 U.S.C. § 1621.)<br><br>Signed: _____ | Complete all questions in this application and then sign it.  Do not leave any blanks: if the answer to a question is "0," "none," or "not applicable (N/A)," write that response. If you need more space to answer a question or to explain your answer, attach a separate sheet of paper identified with your name, your case's docket number, and the question number.<br><br>Date: _____ |

My issues on appeal are: (<u>required</u>):

1.　　*For both you and your spouse estimate the average amount of money received from each of the following sources during the past 12 months. Adjust any amount that was received weekly, biweekly, quarterly, semiannually, or annually to show the monthly rate. Use gross amounts, that is, amounts before any deductions for taxes or otherwise.*

| Income source | Average monthly amount during the past 12 months | | Amount expected next month | |
|---|---|---|---|---|
| | You | <u>Spouse</u> | You | <u>Spouse</u> |
| Employment | $ | $ | $ | $ |
| Self-employment | $ | $ | $ | $ |
| Income from real property (such as rental income) | $ | $ | $ | $ |

- 1 -

SPA-25

| | | | | |
|---|---|---|---|---|
| Interest and dividends | $ | $ | $ | $ |
| Gifts | $ | $ | $ | $ |
| Alimony | $ | $ | $ | $ |
| Child support | $ | $ | $ | $ |
| Retirement (such as social security, pensions, annuities, insurance) | $ | $ | $ | $ |
| Disability (such as social security, insurance payments) | $ | $ | $ | $ |
| Unemployment payments | $ | $ | $ | $ |
| Public-assistance (such as welfare) | $ | $ | $ | $ |
| Other (specify): | $ | $ | $ | $ |
| **Total monthly income:** | **$ 0** | **$ 0** | **$ 0** | **$ 0** |

2. *List your employment history for the past two years, most recent employer first. (Gross monthly pay is before taxes or other deductions.)*

| Employer | Address | Dates of employment | Gross monthly pay |
|---|---|---|---|
| | | | $ |
| | | | $ |
| | | | $ |

3. *List your spouse's employment history for the past two years, most recent employer first. (Gross monthly pay is before taxes or other deductions.)*

| Employer | Address | Dates of employment | Gross monthly pay |
|---|---|---|---|
| | | | $ |
| | | | $ |
| | | | $ |

SPA-26

4. *How much cash do you and your spouse have? $_____*

   *Below, state any money you or your spouse have in bank accounts or in any other financial institution.*

| Financial Institution | Type of Account | Amount you have | Amount your spouse has |
|---|---|---|---|
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |

***If you are a prisoner seeking to appeal a judgment in a civil action or proceeding, you must attach a statement certified by the appropriate institutional officer showing all receipts, expenditures, and balances during the last six months in your institutional accounts. If you have multiple accounts, perhaps because you have been in multiple institutions, attach one certified statement of each account.***

5. *List the assets, and their values, which you own or your spouse owns. Do not list clothing and ordinary household furnishings.*

| Home | Other real estate | Motor vehicle #1 |
|---|---|---|
| (Value) $ | (Value) $ | (Value) $ |
| | | Make and year: |
| | | Model: |
| | | Registration #: |

| Motor vehicle #2 | Other assets | Other assets |
|---|---|---|
| (Value) $ | (Value) $ | (Value) $ |
| Make and year: | | |
| Model: | | |
| Registration #: | | |

- 3 -

SPA-27

6.     *State every person, business, or organization owing you or your spouse money, and the amount owed.*

| Person owing you or your spouse money | Amount owed to you | Amount owed to your spouse |
|---|---|---|
| | $ | $ |
| | $ | $ |
| | $ | $ |
| | $ | $ |

7.     *State the persons who rely on you or your spouse for support.*

| Name [or, if a minor (i.e., underage), initials only] | Relationship | Age |
|---|---|---|
| | | |
| | | |
| | | |

8.     *Estimate the average monthly expenses of you and your family.  Show separately the amounts paid by your spouse. Adjust any payments that are made weekly, biweekly, quarterly, semiannually, or annually to show the monthly rate.*

| | You | Your Spouse |
|---|---|---|
| Rent or home-mortgage payment (including lot rented for mobile home)<br>    Are real estate taxes included?    ☐ Yes  ☐ No<br>    Is property insurance included?    ☐ Yes  ☐ No | $ | $ |
| Utilities (electricity, heating fuel, water, sewer, and telephone) | $ | $ |
| Home maintenance (repairs and upkeep) | $ | $ |
| Food | $ | $ |
| Clothing | $ | $ |
| Laundry and dry-cleaning | $ | $ |
| Medical and dental expenses | $ | $ |

| | | |
|---|---|---|
| Transportation (not including motor vehicle payments) | $ | $ |
| Recreation, entertainment, newspapers, magazines, etc. | $ | $ |
| Insurance (not deducted from wages or included in mortgage payments) | | |
|     Homeowner's or renter's: | $ | $ |
|     Life: | $ | $ |
|     Health: | $ | $ |
|     Motor vehicle: | $ | $ |
|     Other: | $ | $ |
| Taxes (not deducted from wages or included in mortgage payments) (specify): | $ | $ |
| Installment payments | | |
|     Motor Vehicle: | $ | $ |
|     Credit card (name): | $ | $ |
|     Department store (name): | $ | $ |
|     Other: | $ | $ |
| Alimony, maintenance, and support paid to others | $ | $ |
| Regular expenses for operation of business, profession, or farm (attach detailed statement) | $ | $ |
| Other (specify): | $ | $ |
| **Total monthly expenses:** | **$ 0** | **$ 0** |

9. *Do you expect any major changes to your monthly income or expenses or in your assets or liabilities during the next 12 months?*

    ☐ Yes      ☐ No      If yes, describe on an attached sheet.

10. *Have you spent — or will you be spending —any money for expenses or attorney fees in connection with this lawsuit?* ☐ Yes ☐ No

    *If yes, how much?* $ _____

SPA-29

11.     *Provide any other information that will help explain why you cannot pay the docket fees for your appeal.*

12.     *Identify the city and state of your legal residence.*

City _____   State _____

Your daytime phone number: _____

Your age: _____   Your years of schooling: _____

Last four digits of your social-security number: _____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────────┐
│ E & T SKYLINE CONSTRUCTION,          │
│ LLC,                                 │
│                                      │
│      Plaintiff,                      │
│                                      │
│      -v-                             │
│                                      │
│ TALISMAN CASUALTY INSURANCE          │
│ COMPANY, LLC,                        │
│                                      │
│      Defendant.                      │
└─────────────────────────────────────┘
```

19-cv-8069 (JSR)

ORDER

JED S. RAKOFF, U.S.D.J.:

   After a four-day bench trial arising from a construction dispute about the installation of custom windows at a luxury condominium building in Manhattan, the Court issued findings of fact and conclusions of law holding that defendant Talisman Casualty Insurance Company ("Talisman") is not liable to plaintiff E & T Skyline Construction, LLC ("E&T") for surety payment under a performance bond agreement.[1] As the Court explained, Talisman's obligations under the bond agreement arose only if E&T was not itself in default of a separate agreement between E&T and NY Renaissance Corp. ("NYR"), the subcontractor responsible for delivering and installing the custom windows in question. ECF No. 139 ("Post-Trial Op."), at 1, 2-3, 15-16. The Court held that E&T was indeed in default because it failed

─────────────────────

   [1] This Order assumes familiarity with the factual and procedural background of this case, as detailed, inter alia, in the Court's post-trial Findings of Fact and Conclusions of Law, ECF No. 139, and the earlier order denying both parties' cross-motions for summary judgment, ECF No. 116.

1

to provide "the upper floors of the site available for installation (free of current debris and protrusions into the window openings)," which was a material term of the agreement between E&T and NYR (the "Subcontract"). Id. at 16-17.

On December 4, 2023, E&T moved to alter or amend the Court's judgment under Federal Rule of Civil Procedure 59(e). ECF No. 141. Talisman filed opposition papers on December 21, 2023, ECF No. 142, and E&T filed a reply on January 5, 2024, ECF No. 143. After full consideration of the parties' submissions and the trial record, the Court hereby denies the motion.

Federal Rule of Civil Procedure 59(e) "allows a litigant to file a 'motion to alter or amend a judgment.'" Banister v. Davis, 140 S. Ct. 1698, 1703 (2020) (quoting Fed. R. Civ. P. 59(e)). Under Rule 59(e), "courts may consider new arguments based on an intervening change in controlling law and newly discovered or previously unavailable evidence." Id. at 1703 n.2.[2] But "courts will not address new arguments or evidence that the moving party could have raised before the decision issued." Id. at 1703.

E&T makes two arguments in support of reversing the Court's judgment that Talisman is not liable. First, E&T argues that the Court erred as a matter of law in concluding that the terms of a March 8, 2019 revised schedule, proposed by NYR and approved by E&T, were

---

[2] Here and elsewhere, internal alterations, citations, and quotation marks are omitted unless otherwise indicated.

2

incorporated into the Subcontract. Second, E&T argues that the Court's factual assessment conflated impediments to installation of the windows with impediments to delivery of the windows. E&T contends that even if the site conditions made installation of the windows impracticable, nothing prevented NYR from delivering the windows to the project site, which did not occur before E&T terminated NYR. According to E&T, that means E&T was not in default and Talisman was liable under the bond agreement. Neither argument prevails.

E&T's first argument -- that the terms of the March 8, 2019 revised schedule were not part of the Subcontract -- is one that it "could have raised" in its post-trial proposed findings of fact and conclusions of law, Banister, 140 S. Ct. at 1703, but did not. Indeed, the Court addressed the existence of that potential argument in its Findings of Fact and Conclusions of Law. The Court wrote,

> There is also no dispute that the terms of the March 8, 2019 revised schedule form part of the subcontract. The revised schedule states in no uncertain terms that it is "subject to . . . the Owner providing the upper floors of the site available for installation (free of current debris and protrusions into the window openings)." Revised Schedule at 1. Rather than argue that any failure to comply with that condition would not be an "Owner Default" under the Bond Agreement or that the condition was not a material term of the subcontract, E&T instead contends, as a factual matter, that it "indeed provided suitable areas at the Project site to store NYR's materials and equipment and did not

3

hinder or obstruct NYR's ability to deliver the custom windows
to the Project." ECF No. 136, at 31.
Post-Trial Op. at 16-17.

To reiterate the point, E&T's post-trial proposed findings of
fact and conclusions of law contained no argument whatsoever that a
failure to comply with its obligations under the March 8, 2019 revised
schedule would not mean a default under the subcontract or would
otherwise not be a violation of a material term of the subcontract.
To the contrary, E&T's proposed findings of fact and conclusions of
law argued that "Plaintiff complied with and performed its . . .
obligations under the Subcontract" for the specific reason that
"Plaintiff indeed provided suitable areas at the Project site to store
NYR's materials and did not hinder or obstruct NYR's ability to deliver
the custom windows to the Project." ECF No. 136, at 31. In other words,
E&T's submission itself suggested that, if E&T had in fact "hinder[ed]
or obstruct[ed] NYR's ability to deliver the custom windows," E&T
failed to comply with its "obligations under the Subcontract." Id. The
entirety of the section captioned "There Was No Default by Plaintiff"
in E&T's post-trial submission contains factual arguments that E&T
complied with all its obligations -- not any legal arguments, such as
the one that E&T now makes, that certain terms were irrelevant for
determining whether E&T defaulted under the bond agreement. See id.
at 30-32; cf. United States v. Sineneng-Smith, 140 S. Ct. 1575, 1579
("In our adversarial system of adjudication, we follow the principle
of party presentation."). Because E&T's newly raised argument is an

4

improper basis for a Rule 59(e) motion, the Court declines to consider it.

E&T's second argument, regarding the distinction between delivery of windows and installation of windows, is immaterial. The Court has already made a factual finding, based on the entire trial record, including the demeanor and relative credibility of the witnesses, "that obstructions prevented NYR from even delivering the custom windows to the site." Post-Trial Op. at 14; see id. at 15 (crediting testimony that "it was absolutely impossible to deliver any windows to that project site due to other materials and other debris and other things that were all over the floors, in the hallways, in front of window openings"). Moreover, the Court explained that it rejected E&T's assertion "that NYR would have had an incentive to pay for storage of the windows, as it did on its own dime, rather than deliver the windows to the Project site, if such delivery were feasible." Id. at 15. "The Court credit[ed] the testimony of Nicholas Carranza and Dan Pirvulescu that NYR only did so because the Project site could not accommodate the windows." Id. NYR had no incentive, for instance, "to keep the windows for other use or resale, because the windows' design, shape, and size were custom for the Project." Id.

Because neither of E&T's arguments in support of its Rule 59(e) motion have merit, the Court adheres to its judgment that Talisman is not liable. The Clerk is respectfully directed to close document number 141 on the docket of this case, which shall remain closed.

SO ORDERED.

SPA-35

New York, NY
January 11, 2024

JED S. RAKOFF, U.S.D.J.