# 24-0369-cv

## United States Court of Appeals
### *for the*
## Second Circuit

———————————

E & T SKYLINE CONSTRUCTION, LLC,

*Plaintiff-Appellant,*

— v. —

TALISMAN CASUALTY INSURANCE COMPANY, LLC,

*Defendant-Appellee.*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLEE

MICHAEL F. KUZOW
MICHAEL F. MCGOWAN
WESTERMANN SHEEHY SAMAAN
  & GILLESPIE, LLP
*Attorneys for Defendant-Appellee*
90 Merrick Avenue, Suite 802
East Meadow, New York 11554
(516) 794-7500

CP COUNSEL PRESS    (800) 4-APPEAL • (330705)

## I.
## <u>CORPORATE DISCLOSURE STATEMENT</u>

Talisman Casualty Insurance Company, LLC is a Nevada limited liability company and is not a subsidiary of any corporation, and it does not have any stock which can be owned by a publicly held corporation.

## II.
## <u>TABLE OF CONTENTS</u>

III.    TABLE OF AUTHORITIES ............................................................ ii

IV.    COUNTERSTATEMENT OF SUBJECT MATTER
AND APPELLATE JURISDICTION ..............................................1

V.    COUNTERSTATEMENT OF THE ISSUES ...................................2

VI.    COUNTERSTATEMENT OF THE CASE ......................................3

     A.    Introduction .........................................................................3

     B.    The Facts .............................................................................4

VII.    SUMMARY OF TALISMAN'S ARGUMENT ...........................18

VIII.    ARGUMENT.................................................................................20

     A.    Counterstatement of Applicable Standard
of Review ..........................................................................20

     B.    E&T Skyline's Argument....................................................21

          1.    The March 8, 2019 Letter ......................................21
          2.    Delivery and Storage of the Upper
Floor Windows........................................................28

     C.    Miscellaneous Comments .................................................30

IX.    CONCLUSION.............................................................................35

i

### III.
### TABLE OF AUTHORITIES

<u>Cases</u>                                                                 <u>Page(s)</u>

<u>Anderson v. City of Bessemer City</u>, 470 U.S. 564 (1985)..................20, 21 (n.8), 35

<u>Atlantic Specialty Ins. Co. v. Coastal Envtl. Group, Inc.</u>,
945 F.3d 53 (2d Cir. 2019) ........................................................................20

<u>Citibank, N.A. v. Brigade Cap. Mgmt., L.P.</u>,
49 F.4th 42 (2d Cir. 2022) ........................................................................20

<u>Farrell Heating, Plumbing, Air Conditioning Contractors, Inc. v.</u>
<u>Facilities Dev. & Improvement Corp.</u>,
68 A.D.2d 958, 414 N.Y.S.2d 767 (3d Dep't 1979)................................28

<u>Fehlhaber Corp. v. State of New York</u>,
65 A.D.2d 119, 410 N.Y.S.2d 920 (3d Dep't 1978)......................... 26-27

<u>Mobil Shipping & Transp. Co. v. Wonsild Liquid Carriers Ltd.</u>,
190 F.3d 64 (2d Cir. 1999) ........................................................................20

<u>St. Christopher's Inc. v. JMF Acquisitions, LLC</u>,
20-3808, 2021 WL 6122674 (2d Cir., Dec. 28, 2021)............................27

<u>Underpinning & Found. Skanska, Inc. v.</u>
<u>Travelers Cas. & Sur. Co. of Am.</u>,
No. 07-CV-5415, 2010 WL 3735786 (E.D.N.Y., Sep. 20, 2010) ............................18

<u>United States v. Seaboard Sur. Co.</u>, 817 F.2d 956 (2d Cir. 1987)..............5 (n.4), 18

<u>Walter Concrete Constr. Corp. v. Lederle Labs</u>,
99 N.Y.2d 603, 758 N.Y.S.2d 260 (2003) .............................................18

<u>Wolff & Munier, Inc. v. Whiting-Turner Contracting Co.</u>,
946 F.2d 1003 (2d Cir.1991)......................................................................26

Young v. Whitney,
111 A.D.2d 1013, 490 N.Y.S.2d 330 (3d Dep't 1985)..........................................27

Other                                                                                      Page(s)

28 U.S.C. §1332(a)(1)......................................................................................1

28 U.S.C. §1291..............................................................................................1

Fed. R. Civ. Proc. 52(a)(6)............................................................................20

N.Y. C.P.L.R. §302(a)(1) (McKinney 2024)...................................................1

N.Y. Gen. Oblig. Law §7-301 (McKinney 2024) ...........................................5 (n.4)

R. Rubin, S. Biser, C. Brown, 33 N.Y. Prac.,
New York Construction Law Manual, §7:24 (2d Ed. 2023) ..................................26

## IV.
## COUNTERSTATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

Subject matter jurisdiction was predicated on diversity of citizenship pursuant to 28 U.S.C. §1332(a)(1). Subject matter jurisdiction was contested in the lower court. Talisman Casualty Insurance Company, LLC (Talisman) moved to dismiss, alleging the lack of complete diversity of citizenship. The lower court, however, found that there was complete diversity of citizenship and denied the motion. (ECF No. 83, 2022 WL 623858.) That Order was not appealed. Personal jurisdiction of Talisman is predicated on N.Y. C.P.L.R. §302(a)(1).

This Court's jurisdiction is predicated on 28 U.S.C. §1291.

## V.
## <u>COUNTERSTATEMENT OF THE ISSUES</u>

Talisman respectfully submits that the sole issue presented for review is as follows: Whether the lower court's findings of fact were clearly erroneous and conclusions of law correct.

# VI.
# COUNTERSTATEMENT OF THE CASE

## A.    Introduction.

This action was tried before the District Court (Rakoff, J.) on April 24, 25, 26 and 27, 2023.  The District Court heard testimony from four witnesses, Kevin Tolbert of plaintiff, E&T Skyline Construction LLC (E&T Skyline); Dan Pirvulescu of non-party NY Renaissance Corp. (NYR); Oran Revivo, a representative of a non-party architect; and Nicholas Carranza, formally the controller of NYR.  The deposition of John Foster of Talisman was also received in evidence, except for portions to which the District Court sustained objections.  Plaintiff's Exhibits 1 through 151 were all received into evidence, except Exhibits 86 and 151.  Defendant's Exhibits 1 through 45 were all received into evidence.[1]

On November 6, 2023, the District Court issued Findings of Fact and Conclusions of Law and held "that Talisman is not liable."  (SPA-1, Findings of Fact.)  A Judgment in favor Talisman was entered on November 6, 2023.  (SPA-19.)  E&T Skyline then moved pursuant to Federal Rule of Civil Procedure (F.R.C.P.) 59(e), seeking to alter the Judgment.  That motion was denied on January 11, 2024.  (JA-19, SPA 30-35.)  This appeal ensued.

---

[1] The lower court referenced the parties' Joint Statement of Facts in its "Findings of Fact and Conclusions of Law."  (SPA-1.)  The Joint Statement of Facts is not found in the Appendix, but can be found at ECF No. 125.  It is only referenced at Finding of Fact No. 2.  (SPA-2.)

3

**B.** **The Facts.**

The pertinent facts are set forth in the District Court's Findings of Fact and Conclusions of Law which are incorporated herein and need not be recited here at length. (SPA-1.)

Briefly, this litigation arises from the construction of a 40-story residential condominium located at 30 East 31st Street in Manhattan (the Project). (JA-179, K. Tolbert, Trial Transcript, 4/24/23, p. 7.) E&T Skyline was the general contractor to 31st Street ZEF LLC (ZEF), the fee owner of the property and of the Project. (JA-2154, Defendant Exhibit 40.) Erik Ekstein and Kevin Tolbert are the two members of E&T Skyline. There is overlapping ownership between E&T Skyline and ZEF, as Erik Ekstein is also a member of ZEF. (JA-288, K. Tolbert, Trial Transcript, 4/24/23, p. 116, lines 12-23.)

Non-party, NYR, a New York corporation, entered into a subcontract with E&T Skyline, dated November 17, 2016, wherein NYR was to furnish and install approximately 400 rectangular and custom-shaped windows and other related material at the Project (the Subcontract).[2] The base Subcontract price was

---

[2] Despite being a co-obligor on the Performance Bond, E&T Skyline did not join NYR as a party in this action, presumably because NYR is a New York corporation, and to join NY Renaissance would destroy complete diversity of citizenship and federal jurisdiction.

$1,850,000, subject to adjustment.[3]    (JA-706, <u>Plaintiff Exhibit 1</u>; JA-1328, <u>Defendant Exhibit 1</u>.)  E&T Skyline terminated the Subcontract on July 19, 2019.

On February 7, 2017, Talisman issued Performance Bond and Payment Bond No. 1377558 (two documents).  Both the Performance Bond and Payment Bond are modified AIA (American Institute of Architects) A312-2010 forms of surety bonds, each with a penal sum of $1,850,000.[4]    This litigation pertains only to the Performance Bond.  (JA-808, <u>Plaintiff Exhibit 4</u>; JA-1407, <u>Defendant Exhibit 2</u>.)

The aluminum windows NYR was to furnish and install were of two types, rectangular and custom triangle-shaped.  (JA-185, K. Tolbert, <u>Trial Transcript</u>, 4/24/23, p. 13, lines 20-25.)  The custom-shaped windows were to be installed on the upper floors of the building, those floors being floors 33 through 40, together with approximately a dozen rectangular windows.  Upwards of 80 custom-shaped windows were to be installed on the building's upper floors.  (JA-508, D. Pirvulescu, <u>Trial Transcript</u>, 4/26/23, p. 334, lines 8-11.)  The majority of rectangular windows were installed on floors 1 through 32.  "We had rectangle windows up to the 32nd floor."  (JA-185, K. Tolbert, <u>Trial Transcript</u>, 4/24/23, p. 13, line 20.)

---

[3] Pursuant to a Change Order (No. 7J0801.R1) to the Subcontract, dated February 2, 2017, E&T Skyline requested that NYR provide construction surety bonds (being performance and payment bonds).  The premium for the performance and payment bonds was $64,750, which increased the Subcontract amount from $1,850,000 to $1,914,750.  (JA-807, <u>Plaintiff Exhibit 2</u>.)

[4] "It is hornbook law that a surety is liable up to, and only up to, the limit on the bond it issued." <u>United States v. Seaboard Sur. Co.</u>, 817 F.2d 956, 963 (2d Cir. 1987); <u>see also</u> New York General Obligations Law §7-301.

None of the rectangular windows NYR furnished and installed on floors 1 through 32 were ever replaced by E&T Skyline.  (JA-410-411, K. Tolbert, Trial Transcript, 4/25/23, p. 236, line 25 - p. 237, line 5.)  As of the date of the Subcontract termination (July 19, 2019), all of NYR's work that was done below the 33rd floor had been accepted and paid for by E&T Skyline.  (JA-647, D. Pirvulescu, Trial Transcript, 4/27/23, p. 473, lines 5-9.)

Mr. Pirvulescu of NYR testified that the custom-shaped windows were "about 10 feet tall," that some "of them are 2 feet wide by 6 feet," and that some are "5 feet wide by 10 feet tall."  (JA-507-508, D. Pirvulescu, Trial Transcript, 4/26/23, p. 333, line 8 - p. 334, line 1.)  The custom-shaped windows also weighed between 375 to 600 pounds.  (JA-541, D. Pirvulescu, Trial Transcript, 4/26/23, p. 367, lines 13-17.)  As the lower court noted, "[i]ndeed, Kevin Tolbert of E&T corroborated that '[a]ll the windows were floor to floor height,' stretching 'from slab to ceiling,' which was 10 feet." . . .  The custom windows weighed hundreds of pounds each."  (SPA-13, Findings of Fact, #56.)

NYR commenced performance of the Subcontract in November 2016, immediately after the Subcontract was signed, by working on the design documents.  (JA-519, D. Pirvulescu, Trial Transcript, 4/26/23, p. 345.)  NYR commenced performance of the physical work of installation on or about January 2018. (JA-519, D. Pirvulescu, Trial Transcript, 4/26/23, p. 345, lines 15-19.)

6

Pursuant to the Subcontract schedule, NYR was to commence work in January 2017 and complete the Subcontract scope of work by January 2018. (JA-350, K. Tolbert, Trial Transcript, p. 176, lines 7-8; JA-706, Plaintiff Exhibit 1; JA-1328, Defendant Exhibit 1.) As the lower court noted, "it would not have been possible for NYR to complete its work by then because the building's concrete superstructure - - the responsibility of a separate subcontractor with no involvement by NYR - - had not been fully erected. . . . The building's concrete superstructure was not complete until 'May or June of 2018.'"[5] (SPA-3, Findings of Fact, ##9-10.)

NYR entered into a Purchase Order with Giugiaro Architectural Structures, S.P.A. of Verona, Italy (Giugiaro) in 2016 in connection with the window work at the Project. The rectangular and custom-made windows were to be manufactured by Schuco International and fabricated by Giugiaro, in Italy. (JA-917, Plaintiff Exhibit 34.)

In the summer of 2017, a dispute arose between E&T Skyline and NYR. E&T Skyline complained about the progress of the Subcontract work and NY Renaissance, for its part, complained about untimely payment by E&T Skyline. (JA-824-839, Plaintiff Exhibits 17-23.) These disputes culminated in a November 27,

---

[5] Mr. Tolbert testified at trial that NYR could not have completed its work on schedule because, "I believe we were behind with the superstructure, if I recall." (JA-350, K. Tolbert, Trial Transcript, 4/25/23, p. 176, lines 23-24.)

7

2017 Letter Agreement between E&T Skyline and NYR which modified and amended the Subcontract to the extent set forth therein. (JA-1427, <u>Defendant Exhibit 4</u>.)

In late 2018, NYR began having performance issues with Giugiaro, the fabricator of the windows. NYR's problems with Giugiaro pertained to the delay in fabrication and delivery of the custom-shaped windows as well as the eleven or so rectangular windows and related items that were to be installed on the upper floors of the Project. (JA-917, 924, <u>Plaintiff Exhibits 34, 37</u>.) Giugiaro's performance did not improve and, as a result, on February 1, 2019, NYR sent Giugiaro a Notice of Default. (JA-917, <u>Plaintiff Exhibit 34</u>.)

When Giugiaro failed to cure its default or even respond to the Notice of Default, NYR terminated the Purchase Order with Giugiaro in connection with the remaining windows to be fabricated for the Project in a letter dated February 8, 2019. (JA-924, <u>Plaintiff Exhibit 37</u>.)

At or about that same time, NYR sent Metal-Ser Srl, a "letter of intent" regarding the fabrication of the custom-shaped windows and the balance of the rectangular windows to be installed on floors 32 to 40. Metal-Ser Srl is another window fabricator located in Italy and was used by NYR to fabricate the custom-shaped windows after Giugiaro's termination. Wicona was the manufacturer of the aluminum windows. (JA-1439, <u>Defendant Exhibit 5</u>; JA-923, <u>Plaintiff Exhibit 36</u>.)

8

E&T Skyline was advised of the change of supplier and Mr. Tolbert testified at trial that, "[w]e said we would allow that as long as the manufactured product meets the same specification performance criteria." (JA-215, K. Tolbert, Trial-Transcript, 4/24/23, p. 43, lines 2-4; JA-1581, Expert Report, Summary, ¶E; JA-1585-1586, Defendant Exhibit 31 (addressing the Wicona windows meeting the performance criteria).)

Notwithstanding the foregoing, in a February 22, 2019 letter, E&T Skyline threatened to terminate the Subcontract if NYR did not produce "a comprehensive plan of action with a recovery schedule." E&T Skyline also sought a conference with Talisman to discuss NYR's performance at the Project. (JA-928, 929, Plaintiff Exhibits 39, 40.)

NYR responded to E&T Skyline's February 28, 2019 letter and expressed its commitment to completing the Project. (JA-1443, Defendant Exhibit 7.) NYR next submitted the requested recovery schedule on March 8, 2019, which was expressly subject to several factors:

> We must inform you that this schedule is subject to impact from several factors, including, without limitation, (a) approval by the Owner and the Owner's architect and design team no later than March 12, 2019 of the Wicona system drawings submitted by NYR on March 5; (b) approval by the Owner's design team of the custom-shaped window sizes no later than March 12, 2019 (pending since October 31, 2018 and required by the Owner's design team since the shapes and sizes required by the field measurements differ from the approved Construction Documents); ***and (c) the Owner providing the upper floors of the site***

9

> **available for installation (*free of current debris and protrusions into the window openings*),** among others. NYR requests that the Owner (a) provide the necessary approvals (a and b) and compel the Owner's design team to act to provide prompt approval and ***(b) compel its contractors to remove debris from the upper floors and otherwise make installation possible including by removing the protrusions currently in place (see example photos from March 8, 2018 [sic].)*[6]**

(emphasis added) (JA-1447, <u>Defendant Exhibit 8</u>; JA-935, <u>Plaintiff Exhibit 44</u>.)

NYR's photographs of the site conditions taken in March 2019 were received in evidence.  (JA-1455-1461, <u>Defendant Exhibit 9</u>.)

On April 16, 2019, in response to E&T Skyline's attempt to charge NYR for the storage of the kitchen cabinets "due to the delay of the custom windows," (JA-1451, <u>Defendant Exhibit 9</u>) Nick Carranza of NYR responded by email at 5:40 p.m. that day and again advised E&T Skyline that the upper floors were not "ready to receive the custom windows," because of the "numerous obstructions throughout floors 33-39."  (JA-1450, <u>Defendant Exhibit 9</u>.)  Mr. Carranza again emailed Mr. Tolbert at 5:50 p.m. that "there is no way to install windows even if they were onsite today."  (JA-1449, <u>Defendant Exhibit 9</u>.)  Mr. Carranza's email attached a three-page, floor-by-floor detailed report, describing the obstructions that would have precluded NYR from installing the custom-shaped windows upon arrival from Italy. (JA-1449-1461, <u>Defendant Exhibit 9</u>; JA-667, N. Carranza, <u>Trial Transcript</u>,

---

[6] The March 8, 2018 date is an error and should be read March 8, 2019.  <u>Declaration of Dan Pirvulescu</u>, p. 4, ¶14, April 12, 2021. (ECF No. 104.)

4/27/23, p. 493, lines 6-25.)  The lower court discussed the report at length.  (SPA-4-6, Findings of Fact, ##15-25.)

On May 4, 2019, in yet another email, Mario Lisman of NYR again pointed out the need to clear "each level to access the openings."  (JA-1462, Defendant Exhibit 10.)

On May 24, 2019, NYR reiterated by letter that "[w]e would also like to point out that there are still many areas that NYR does not have access to install custom shape receptors,"[7] due to "other trade materials on the other floors" and "protrusions in the window openings."  (JA-1465, Defendant Exhibit 11.)

By letter dated June 10, 2019, however, E&T Skyline continued to threaten termination.  (JA-14776, Defendant Exhibit 13.)  NYR responded on June 13, 2019, in a 1:39 p.m. email, and consented to E&T Skyline making a direct payment to Metal-Ser Srl, the new window fabricator, and to Wicona, the new window manufacturer, and also described the status of the custom-shaped windows and enclosed copies of the shipping documentation.  (JA-1046, Plaintiff Exhibit 54; JA-1478-1484, Defendant Exhibit 14.)

NYR's legitimate concern about the conditions on the upper floors is further demonstrated by the Indus Architect PLLC (Indus) Report on Oran Revivo's June

---

[7] "A receptor is framing for a window around the perimeter of the opening, which provides additional stability and is installed before the window itself."  (SPA-6, Findings of Fact, p. 6, n.3.)

11

13, 2019 visit to the job site. The Indus Report states that, "Floors 34, 35, 37, 38, and 39 all had construction materials in place, at the north side of the building, that prevented Mr. Revivo from properly inspecting certain openings . . . ." (JA-1078, Plaintiff Exhibit 57.)

Despite these concerns, NYR reiterated that the custom-shaped windows had been released to the transport company and provided documentation showing such. (JA-1464-1465, Defendant Exhibit 11.) In that regard, NYR provided E&T Skyline with the status of the custom-shaped windows in an email from Nick Carranza of NYR to Kevin Tolbert of E&T Skyline on June 13, 2019, which included a copy of Yang Ming Marine Transport Corp.'s documents for shipment from Genoa, Italy to New York. (JA-1046, Plaintiff Exhibit 54.) Mr. Tolbert, for his part, acknowledged at trial that, "[t]hey produce[d] the bill of lading and everything." (JA-231, K. Tolbert, Trial Transcript, 4/24/23, p. 59, line 21.) The bill of lading issued by NYR's freight forwarder, Del Corona & Scardigli, reflected the "[d]elivery of goods through AB Global Logistics Consulting" in "Secacus [*sic*] NJ 07094" by Vetraria Fratelli Colpani SRL, the shipper of the custom-made windows. (JA-1470, Defendant Exhibit 12.)

Mr. Pirvulescu testified that when the windows could not be directly delivered to the Project site because of site conditions, they were stored in the Secaucus, New

12

Jersey facility. (JA-652, D. Pirvulescu, <u>Trial Transcript</u>, 4/27/23, p. 478, line 9.) Thereafter, NYR arranged to place the windows in storage in Avenel, New Jersey and in Brooklyn, New York, as NYR was advised that space in the Secaucus facility was needed for other goods coming into port. (JA-1581, 1584, <u>Defendant Exhibit 31</u> (showing the custom shaped windows in Brooklyn and Avenel, New Jersey).)

NYR further responded to E&T Skyline's June 10, 2019 letter threatening termination, stating that "there has been no NYR failure, just a failure to provide NYR with sufficient access, properly sized concrete openings, among other continuing Project issues." (JA-1488, <u>Defendant Exhibit 16</u>.)

On July 12, 2019, at 3:47 p.m., E&T Skyline sent another email to NYR stating that "we found out through a 3rd party that the windows came into port on 6/28 and you took possession of them in lieu of delivering them directly to the site." (JA-1492, <u>Defendant Exhibit 18</u>.) NYR immediately responded that day at 4:37 p.m. that E&T Skyline's claims were completely false, noting that "NYR took the extra measure to receive and store the shipment to prevent the windows from being damaged and took the initiative to incur additional charges to store the material in a controlled environment." NYR explained that it did so because it was "very clear there are many obstructions onsite that will not allow NYR to deliver the windows . . . ." (JA-1491, <u>Defendant Exhibit 18</u>; JA-665-667, N. Carranza, <u>Trial Transcript</u>, 4/27/23, pp. 491-493.)

13

Later on July 12th at 5:43 p.m. and again at 5:45 p.m., NYR emailed E&T Skyline asking to walk the site on Monday, July 15, 2019 "in order to clear the path for us to install the windows." (JA-1495, <u>Defendant Exhibit 19</u>.)

Despite the numerous emails and letters from March 2019 through the date of termination, Mr. Tolbert testified at trial: "They didn't mention anything prior to the shipment coming. They didn't mention anything when they had the windows in their possession. When I found out that they received the windows and took them off site, they started to claim that oh, we can't deliver them. This site is cluttered. Which, you know, I walked the site two or three times a week, completely not true." (JA-232, K. Tolbert, <u>Trial Transcript</u>, 4/24/23, p. 60, lines 12-17.) The lower court, however, found "Tolbert's assertion not to be credible in light of the contemporaneous photographic and documentary evidence and the credible testimony of other witnesses to the contrary." (SPA-15, <u>Findings of Fact</u>, #63.)

Indeed, the record clearly reflects that NYR had been telling E&T Skyline since early March 2019 of the need for an open and clear workspace on the upper floors. (JA-1447, <u>Defendant Exhibit 8</u>; JA-935, <u>Plaintiff Exhibit 44</u>; JA-1541-1580, <u>Defendant Exhibit 30</u> (photos of upper floors); JA-1449-1461, <u>Defendant Exhibit 9</u>; JA-667-674, N. Carranza, <u>Trial Transcript</u>, 4/27/23, pp. 493-500; JA-1462-1463, <u>Defendant Exhibit 10</u>; JA-1464-1469, <u>Defendant Exhibit 11</u>.)

14

On July 17, 2019, two days before termination, NYR again advised E&T Skyline by email, multiple times, that the "windows are in storage" and could not be delivered or installed because there was no room to walk and could not be installed until the "outriggers used for the exterior panels is [*sic*] moved to roof as we were told months ago and the hoist is taken down." (JA-1504, <u>Defendant Exhibit 21</u>; JA-1117, <u>Plaintiff Exhibit 66</u>.)

On July 18, 2019, NYR again wrote E&T Skyline and advised that the custom-shaped windows were in off-site storage, but could not be delivered or installed because of the existing on-site obstructions. (JA-1512-1516, <u>Defendant Exhibits 22, 23</u>; JA-534-536, D. Pirvulescu, <u>Trial Transcript</u>, 4/24/23, p. 360, line 7 – p. 362, line 17.)

On July 19, 2019, NYR once again emailed E&T Skyline requesting a meeting to find a solution to complete the remaining contract and stated "NYR is standing ready to install windows." (JA-1515, <u>Defendant Exhibit 23</u>.)

E&T Skyline responded by email that same day at 8:11 a.m., and stated: "You failed to Cure the Breach, we are moving forward with the termination" and that "[a]ll windows can/should have been delivered and stored in the designated floors and all windows can be installed in all opening [*sic*] except the north elevation on two floors where the hanging scaffold and overhead protection is installed and the

hoist access points." (JA-1206, <u>Plaintiff Exhibit 72</u>; JA-1517, <u>Defendant Exhibit 24</u>.)

This statement is plainly contradicted by the photographs taken by NYR in the Spring of 2019, which were received into evidence, and the testimony of Nicholas Carranza and Dan Pirvulescu. (JA-1541-1580, <u>Defendant Exhibit 30</u>; JA-668-674, N. Carranza, <u>Trial Transcript</u>, 4/27/23, pp. 489-500; JA-648, D. Pirvulescu, <u>Trial Transcript</u>, 4/25/23, p. 474, lines 3-25.)

This statement is also contradicted by the photographs taken by E&T Skyline itself and received into evidence. Many of the photographs show the outriggers needed for the scaffolding still in place and obstructing access to the window openings. (JA-1140-1197, <u>Plaintiff Exhibit 69</u>; JA-254-256, K. Tolbert, <u>Trial Transcript</u>, 4/24/23, pp. 82-84.)

On inquiry by the lower court, Mr. Tolbert conceded, "[w]e're not saying floors 33 through 40 they can put in *all* the windows, what we are saying is you have plenty of windows to put in." (emphasis added). (JA-262, K. Tolbert, <u>Trial Transcript</u>, 4/24/23, p. 90, lines 1-7.)

E&T Skyline terminated the Subcontract on July 19, 2019. (JA-1208, <u>Plaintiff Exhibit 73</u>; JA-1519, <u>Defendant Exhibit 26</u>.) E&T Skyline's termination notice makes no mention of defective work by NYR. (JA-1208, <u>Plaintiff Exhibit 73</u>; JA-329-331, K. Tolbert, <u>Trial Transcript</u>, 4/25/23, pp. 155-157.) By that time, all of

16

NYR's work below the 33rd floor had been completed and accepted and paid for by E&T Skyline. (JA-647, D. Pirvulescu, <u>Trial Transcript</u>, 4/27/23, p. 473, lines 5-9.) None of the rectangular windows NYR furnished and installed on floors 1 through 32 were ever replaced by E&T Skyline. (JA-410-411, K. Tolbert, <u>Trial Transcript</u>, 4/25/23, p. 236, line 25 - p. 237, line 5.)

E&T Skyline then made demand on Talisman pursuant to Paragraph 4 of the Performance Bond. (JA-1209, <u>Plaintiff Exhibit 74</u>.) On August 21, 2019, after it completed its investigation, Talisman denied E&T Skyline's claim in a letter and sent a dropbox of documents supporting that denial via email. (JA-1685, <u>Defendant Exhibit 32</u>; JA-67-81, <u>Deposition of John Foster</u>, 3/12/20, pp. 48-62.)

E&T Skyline commenced this action on August 28, 2019. (JA-1, ECF No. 1.)

## VII.
## <u>SUMMARY OF TALISMAN'S ARGUMENT</u>

In New York, a bond is a contract and a court looks to standard principles of contract interpretation to determine the rights and obligations of a surety. <u>Underpinning & Found. Skanska, Inc. v. Travelers Cas. & Sur. Co. of Am.</u>, No. 07-CV-5415, 2010 WL 3735786 (E.D.N.Y., Sep. 20, 2010). "Surety bonds--like all contracts--are to be construed in accordance with their terms." <u>Walter Concrete Constr. Corp. v. Lederle Labs</u>, 99 N.Y.2d 603, 605, 758 N.Y.S.2d 260 (2003). Further, a surety's liability is derivative of its principal's liability. <u>United States v. Seaboard Sur. Co.</u>, 817 F.2d 956, 962 (2d Cir. 1987).

Talisman's Performance Bond provides at Section 3, "[i]f there is no Owner Default under the Construction Contract, the Surety's obligation under this Bond shall arise after . . . ." (JA-1408, <u>Defendant Exhibit 2</u>, §3.) Talisman's obligations under the Performance Bond are thus subject to defeasance by a condition subsequent and are only invoked if there is no "Owner Default." (JA-1408, <u>Defendant Exhibit 2</u>, §3.) "Owner Default" is defined in the Performance Bond as:

> §14.4 Owner Default. Failure of the Owner, which has not been remedied or waived, to pay the Contractor as required under the Construction Contract or to perform and complete or comply with the other material terms of the Construction Contract.

(JA-1409, <u>Defendant Exhibit 2</u>, §14.4.)

18

Based on the evidence presented at trial, both oral and documentary, the lower court properly concluded:

> "that because E&T failed to make the upper floors of the Project site - - floors 33 to 40, where the custom windows were to be installed – available for installation by clearing those floors of debris and obstructions, E&T was in default of its obligations under the subcontract. And because the lack of any default by E&T was a condition precedent to Talisman's obligations under the Bond Agreement, Talisman held no such obligations and is not liable."

(SPA-17, <u>Conclusions of Law</u>.)

**VIII.**
**ARGUMENT**

**A.** **Counterstatement of Applicable Standard of Review.**

After a bench trial, the lower court's findings of fact are reviewed for clear error and its conclusions of law reviewed *de novo*. Mixed questions of law and fact are also reviewed *de novo*. Citibank, N.A. v. Brigade Cap. Mgmt., LP, 49 F.4th 42, 58 (2d Cir. 2022).

This Court has held that, "[u]nder the clear error standard, we 'may not reverse [a finding] even though convinced that had [we] been sitting as the trier of fact, [we] would have weighed the evidence differently.'" Mobil Shipping & Transp. Co. v. Wonsild Liquid Carriers Ltd., 190 F.3d 64, 67 (2d Cir. 1999) (alterations in original) (quoting Anderson v. City of Bessemer City, 470 U.S. 564, 574 (1985)). "Rather, a finding is clearly erroneous only if 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" Atlantic Specialty Ins. Co. v. Coastal Envtl. Grp., Inc., 945 F.3d 53, 63 (2d Cir. 2019) (quoting Mobil Shipping & Transp. Co., 190 F.3d at 67-68).

Significantly, F.R.C.P. Rule 52 (a)(6) provides:

(6) **Setting Aside the Findings**. Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous,

20

and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility.[8]

**B.** **E&T Skyline's Argument.**

E&T Skyline's claim is that NYR failed to timely furnish and install the custom-shaped and a dozen rectangular windows on the upper floors of the Project, and that Talisman's principal, NYR, intentionally withheld the windows to leverage E&T Skyline, presumably for payment. E&T Skyline terminated the Subcontract on July 19, 2019, due solely to NYR's alleged failure to deliver the custom-shaped windows. (JA-329, K. Tolbert, Trial Transcript, 4/25/23, p. 155, lines 19-22.)

**1.** **The March 8, 2019 Letter.**

The crux of E&T Skyline's appeal is that the lower court misinterpreted the March 8, 2019 letter and recovery schedule, as well as the scope of E&T Skyline's obligations under the Subcontract, and at common law, to provide clear and unobstructed site access during construction.

E&T Skyline's argument is summarized on page 2 of its Appellant's Brief, wherein it argues that, in holding that Talisman was not liable, "the Honorable Jed S. Rakoff found that [E&T Skyline] itself had defaulted under the Subcontract based *solely* on a March 8, 2019 letter transmitted by NYR to [E&T Skyline], the self-serving terms of which the Court improperly concluded formed a part of the

---

[8] This standard of review applies to bench trials. Anderson, 470 U.S. at 573.

21

Subcontract and mistakenly interpreted to [*sic*] as imposing additional obligations on [E&T Skyline], without any writing signed by [E&T Skyline] or any legal consideration being given." (emphasis added). (Appellant's Brief, p. 2.)[9]

More accurately, the lower court found E&T Skyline in default based on the evidence and testimony that the site conditions on the upper floors of the building where the custom-shaped windows were to be installed impeded and obstructed NYR from installing or even delivering the custom-shaped windows.

Specifically, the lower court found:

48. At trial, the Court heard testimony from numerous witnesses whom the Court found fully credible corroborating the contemporaneous photographs, emails, and letters that showed construction debris, materials, and other items clogging routes of access to, and spaces directly in front of, the openings for the custom windows.

49. For instance, the Court credits the testimony of Nicholas Carranza, who was the controller of NYR with some project management responsibilities from May 2017 to January 2020 but is no longer employed there. Carranza visited the Project site consistently from February to July 2019. Tr. 489-90.

50. Carranza described that in February 2019, the floors on which the custom windows were to be installed - - the "upper floors" of the building - - contained "stacks of panels all over," "metal studs and framing for the . . . carpenter," and "miscellaneous materials, whether it's plywood, they had gypsum board, the green gypsum board installation . . . stored on the upper floors." Tr. 491.

---

[9] On page 22 of its Appellant's Brief, E&T Skyline states: "Judge Rakoff's decision was *largely* based on a finding that E&T had accepted the March 8, 2019 recovery schedule as a modification to the Subcontract, and that the schedule imposed an obligation onto E&T regarding the upper floors of the Project." (emphasis added). (Appellant's Brief, p. 22.)

51. According to Carranza, in March 2019 "[n]othing really changed" and the upper floors of the building were marked by "[v]ery similar conditions." Tr. 491.

52. According to Carranza, in April 2019, the upper floors again had "[v]ery similar conditions," in addition to "rigging materials that were basically all over the floors holding the scaffolding in place." Tr. 491-492.

53. According to Carranza, May 2019 was more of the "[s]ame conditions" on the upper floors. Tr. 492.

54. According to Carranza, his observations in June 2019 showed the "[s]ame thing" on the upper floors - - "still the piles of the metal framing, the panels for the exterior work was still up there." Id. "The scaffolding [was] still up there." Id. "There was also steel tubing being stored on the roof on those floors as well." Id.

55. Finally, according to Carranza, he saw "[s]till very similar conditions" in July 2019. Id. "The panels, the framing the scaffolding was still up, everything was basically the same." Id. at 492-93.

56. Dan Pirvulescu, NYR's technical director who appeared under subpoena and had been at the Project site daily in spring 2019, testified similarly and credibly.

(SPA-12-13, <u>Findings of Fact</u>, ##48-56.)

E&T Skyline asks this Court, on review, to set aside these findings, despite the lower court's opportunity to judge the witnesses' credibility, as clearly erroneous. The lower court's holding was not based <u>solely</u> or even "<u>largely</u>" on "a March 8, 2019 letter," as urged by E&T Skyline, but on the oral testimony of Talisman's witnesses, which were found not only fully credible, but corroborated by contemporaneous photographs, emails and letters. The lower court further found the

testimony of E&T Skyline's principal witness, Kevin Tolbert, to be not credible in light of the contemporaneous photographic and documentary evidence and credible testimony of the other witnesses which was all to the contrary.

E&T Skyline argues that the March 8, 2019 letter (JA-1447, <u>Defendant Exhibit 8</u>; JA-935, <u>Plaintiff Exhibit 44</u>) "did not undisputedly 'form part of the subcontract' and was not a formal modification, pursuant to the terms and conditions of the agreement." (<u>Appellant's Brief</u>, p. 27.) Yet in its June 10, 2019 (JA-1044, <u>Plaintiff Exhibit 53</u>; JA-1470, <u>Defendant Exhibit 12</u>) and July 15, 2019 (JA-1106, <u>Plaintiff Exhibit 64</u>) default letters, E&T Skyline adopts the recovery schedule set forth in the March 8, 2019 letter. In both the June 10, 2019 and July 15, 2019 default letters, E&T Skyline states: "Pursuant to Section 7.2 of the Construction Contract, E&T hereby gives notice that NYR has materially breached the Construction Contract in many ways, including, without limitation, as follows: ***failing to meet the deadline in NYR's recovery schedule dated March 8, 2019*** . . . ." (emphasis added). (JA-1044, <u>Plaintiff Exhibit 53</u>; JA-1470, <u>Defendant Exhibit 12</u>; JA-1106, <u>Plaintiff Exhibit 64</u>.)

E&T Skyline cannot legitimately predicate a default on failing to meet a Subcontract term or requirement, while also arguing that the term or requirement was not part of the Subcontract.

Regardless of whether the March 8, 2019 letter formed part of the Subcontract, it clearly modified the window schedule, and it did not modify E&T Skyline's obligation under the Subcontract to provide an accessible work site, clear of construction debris, materials and other items clogging access routes and spaces adjacent to the window openings for the large, heavy and expensive windows that were to be installed over 30 stories above midtown Manhattan. The primary relevance and importance of the March 8, 2019 letter is that it shows that, as early as March 8, 2019, NYR was concerned about the conditions on the upper floors and notified E&T Skyline of the debris and protrusions in the window openings that precluded delivery and installation.[10]

Here, the installation of very large, heavy and expensive custom-shaped windows 33 to 40 stories above midtown Manhattan required a clear and unobstructed work site which E&T Skyline failed to provide, rendering performance of the work impossible or, at least, greatly impeding NYR's ability to safely and efficiently perform the work.

---

[10] On this point, the lower court noted in its decision on E&T Skyline's FRCP Rule 59(e) motion, that "E&T's first argument - - that the terms of the March 8, 2019 revised schedule were not part of the Subcontract - - is one that "could have been raised" in its post-trial proposal findings of fact and conclusions of law, . . . but did not," and declined to consider it. It was not previously raised because it was crafted after the fact. Talisman respectfully submits this same disposition reached in the lower court should apply on appeal. (SPA-32, Order.)

25

The Subcontract expressly required that NYR "[p]rotect all materials under this trade from being damaged by properly carting and securing before installed in place." (JA-706, 755, <u>Plaintiff Exhibit 1</u>, p. 50, Item 35.)

The Subcontract also expressly required that:

§3.1.2 The Contractor shall provide suitable areas for storage of the Subcontractor's materials and equipment during the course of the Work. Additional costs to the Subcontractor resulting from relocation of such storage areas at the direction of the Contractor, except as previously agreed upon, shall be reimbursed by the Contractor.

(JA-708, <u>Plaintiff Exhibit 1</u>, §3.1.2.)

Even had the Subcontract not contained a provision such as Section 3.1.2, site access is a fundamental obligation of every construction contract. "One of the fundamental contractual obligations of an owner [or a general contractor] to its contractor [or subcontractor] is to make an unobstructed work site available so the contractor [or subcontractor] can do its work." R. Rubin, S. Biser, C. Brown, 33 N.Y. Prac., <u>New York Construction Law Manual</u>, §7:24 (2d Ed. 2023). "Under New York law each party to a construction contract impliedly agrees 'not to hinder or obstruct [the other's] performance.' . . . Indeed, each party has an affirmative obligation to facilitate the other's performance." <u>Wolff & Munier, Inc. v. Whiting-Turner Contracting Co.</u>, 946 F.2d 1003, 1007 (2d Cir.1991) (internal citations omitted) (alterations in original); <u>Fehlhaber Corp. v. State of New York</u>, 65 A.D.2d

26

119, 125, 410 N.Y.S.2d 920, 925 (3d Dep't 1978) (the obligation to furnish the contractor with an unobstructed site is implied in every construction contract).

E&T Skyline was in default of its obligations under Section 3.1.2 of the Subcontract, as well as those imposed by common law, to provide an unobstructed project site. E&T Skyline failed to perform this fundamental contractual obligation, thereby discharging NYR of liability under the Subcontract and, as found by the lower court, Talisman from liability under the Performance Bond. If there is "Owner Default," Talisman is expressly relieved of liability by the terms of the Performance Bond. (JA-1407, Defendant Exhibit 2.) "The Court concludes that because E&T failed to make the upper floors of the project site - - floors 33 to 40, where the custom windows were to be installed - - available for installation by clearing those floors of debris and obstructions, E&T was in default of its obligations under the subcontract." (SPA-17, Conclusions of Law, p. 17.)

Talisman did not have to show that E&T Skyline's actions or inactions rendered NYR's performance impossible, only that E&T Skyline's acts or omissions greatly disrupted and frustrated NYR's performance. St. Christopher's Inc. v. JMF Acquisitions, LLC, 20-3808, 2021 WL 6122674 (2d Cir., Dec. 28, 2021) (if one party to a contract hinders, prevents or makes impossible performance by the other party, the latter's failure to perform will be excused); Young v. Whitney, 111 A.D.2d 1013, 490 N.Y.S.2d 330 (3d Dep't 1985) (contractor only

27

required to show that owner's acts greatly disrupted and frustrated performance); <u>Farrell Heating, Plumbing, Air Conditioning Contractors, Inc. v. Facilities Dev. & Improvement Corp.</u>, 68 A.D.2d 958, 414 N.Y.S.2d 767, 770 (3d Dep't 1979) (defendant need only show that owner's acts greatly disrupted performance).

### 2.  **Delivery and Storage of the Upper Floor Windows.**

To avoid the Court's finding that "E&T was in default of its obligations under the subcontract," E&T Skyline argues that the delivery of the custom-shaped windows should be decoupled from the installation of the windows.[11] (Appellant's Brief, pp. 27-28.)  In other words, according to E&T Skyline, because delivery of the windows was not precluded by its failure to provide a clear and unobstructed work site, its default in that regard was immaterial and the language of Section 3 of the Performance Bond regarding "no Owner Default" was not invoked or relevant.

E&T Skyline concedes that it had an obligation to provide storage space for the windows, but asserts that "[t]here is no requirement as to the exact location for said storage" and that it never had an obligation to provide "temporary storage" on the upper floors, and that "E&T proved that ample storage was available on the lower floors." (<u>Appellant's Brief</u>, pp. 25, 26.)

---

[11] The Subcontract provides at Schedule "A" that NYR "*[f]urnish* all necessary labor, material and equipment to supply *and install* all windows, etc." (emphasis added). (JA-1376, <u>Defendant Exhibit 1</u>, at Schedule "A" Scope of Work, Item 1.)

28

This argument was also contrived after-the-fact because on the morning of July 19, 2019 (the date of termination), E&T Skyline was expressly directing that the windows be delivered and stored on the designated floors.  Mr. Tolbert emailed Ms. Delacroix of NYR stating, in pertinent part:

> Your claim that you can't deliver, distribute and store the windows on the floors they are designated to go is a lie and not worth a response.
> * * *
> All windows can/should have been delivered and stored in the designated floors and all windows can be installed in all opening [*sic*] except the north elevation on two floors where the hanging scaffold and overhead protection is installed and the hoist access points.

(JA-1517, Defendant Exhibit 24.)

As the lower court noted, the installation of very large, heavy and expensive custom-shaped windows 33 to 40 stories above midtown Manhattan required a clear and unobstructed work site which E&T failed to provide, rendering performance of the work impossible or, at least, greatly impeding NYR's ability to safely and efficiently perform the work.  (SPA-17, Conclusions of Law, p. 17.)  The Subcontract expressly required that NYR "[p]rotect all materials under this trade from being damaged by properly carting and securing before installed in place." (JA-1377, Defendant Exhibit 1, at Schedule "A" Scope of Work, Item 35.)  The Subcontract also expressly required that:

> §3.1.2 The Contractor shall provide suitable areas for storage of the Subcontractor's materials and equipment during the course of the Work.  Additional costs to the Subcontractor resulting from relocation

29

of such storage areas at the direction of the Contractor, except as previously agreed upon, shall be reimbursed by the Contractor.

(JA-1330, Defendant Exhibit 1, §3.1.2.)

On this point Mr. Pirvulescu of NYR testified at trial that:

A     As of July '19 when we got terminated, 2019, it was absolutely impossible to deliver any windows to that project site due to other materials and other debris and other things that were all over the floors, in the hallways, in front of window openings.  It was absolutely impossible.  It would be – created an unsafe condition.  The material would have got damaged.  And they were threatening us.  We've been threatened all along about we'll call the bond on you.  You don't do this. You have to protect the material.  We said clear the floors, very simple statement.  Clear the floors, give us clear floors, we'll bring the windows.  E&T actually inspected those windows.  Kartik Patel went to see the windows in existence.  There was no question about non existence in of those particular windows in our possession our cost of store register [*sic*][storage].  We want to get rid of those windows to bring them to the job site because we were paying for storage.  We are still paying for storage today.

\* \* \*

THE COURT:     I just have one quick question.
The windows you were just referring to are what we sometimes have been calling custom windows?
THE WITNESS:   Yes.

(JA-648, D. Pirvulescu, Trial Transcript, p. 474, lines 3-25.)

## C.    Miscellaneous Comments.

Throughout its Appellant's Brief, E&T Skyline alleges various instances of default by NYR which are unrelated to the delivery or installation of the custom-shaped windows.  This is presumably to poison the well on NYR's performance.

30

These allegations are not relevant or material, but require comment. For example, E&T Skyline states that "Indus Architects PLLC ("Indus") discovered numerous defects related [to NYR's work] including failed water tests, improper and inconsistent sealing at the windows, improperly installed exterior flashing, improper shim placement, and a general failure to perform field measurements of the window opening." (Appellant's Brief, p. 10.) The quoted report pertains to the rectangular windows furnished and installed on the lower floors of the building and is from April 2018, over a year prior to the July 2019 Subcontract termination. Similarly, "an inspection by Indus again identified several window deficiencies." Id. at p. 15. That inspection and report in April 2019 also pertains to the rectangular windows on the lower floors and has no relevance here.

As previously stated, Mr. Tolbert testified that none of the rectangular windows NYR furnished and installed on floors 1 through 32 were replaced by E&T Skyline. (JA-410-411, K. Tolbert, Trial Transcript, 4/25/23, p. 236, line 25 - p. 237, line 5.) Mr. Pirvulescu likewise testified that as of July 19, 2019, the date of Subcontract termination, all of NYR's work on the lower floors had been completed, accepted and paid for by E&T Skyline. (JA-647, D. Pirvulescu, Trial Transcript, 4/27/24, p. 473, lines 5-9.) The July 19, 2019 Subcontract termination pertained

31

only to the custom-shaped windows and had nothing to do with the work on the lower floors.[12]

Notable too, is that Mr. Tolbert testified regarding E&T Skyline's requisitions to the owner of the Project at trial. (JA-363-375, K. Tolbert, Trial Transcript, pp. 189-201.) On each requisition, E&T certified under oath that:

> The undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief the Work covered by this Application for Payment **has been completed in accordance with the Contract Documents**, that all amounts have been paid by the Contractor for Work for which previous Certificates for Payment were issued and payments received from the Owner, and that current payment shown herein is now due.

(emphasis added). (For example, see JA-1879, Defendant Exhibit 38A.)

A representative of the Project architect, Morris Adjimi Architects, also certified that:

> In accordance with the Contract Documents, based on on-site observations and the data comprising the application, the Architect certifies to the Owner that to the best of the Architect's knowledge, information and belief the Work has progressed as indicated, **the quality of the Work is in accordance with the Contract Documents**, and the Contractor is entitled to payment of the AMOUNT CERTIFIED.

(emphasis added). (For example, see JA-1879, Defendant Exhibit 38A.)

---

[12] On July 19, 2019, Mr. Tolbert emailed NYR: "You are being terminated because you refuse to deliver the windows." (JA-1517, Defendant Exhibit 24.)

Each requisition to the owner contained a representation by Mr. Tolbert that the work for which payment was sought by E&T Skyline, including NYR's work, was completed in accordance with the contract documents. Each requisition also contained an affirmative representation by the architect that "the quality of the Work is in accordance with the Contract Documents." (For example, see JA-1879, Defendant Exhibit 38A.) E&T Skyline's Requisition No. 33 is through the period July 24, 2019, which is five-days after the Subcontract was terminated. (JA-1888, Defendant Exhibit 38AA.)[13] E&T Skyline's Requisition Nos. 38A through 38GG contained these same representations. When E&T Skyline was seeking payment from the owner, or the owner's lender, the work was in accordance with the contract documents, but when seeking payment from Talisman, the work was deficient.

The decision and Judgment of the lower court should be affirmed in this case because the trial judge is in the best position to assess the credibility of the witnesses and to determine the facts. As the Supreme Court has explained:

> The trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise. Duplication of the trial judge's efforts in the court of appeals would very likely contribute only negligibly to the accuracy of fact determination at a huge cost in diversion of judicial resources. In addition, the parties to a case on appeal have already been forced to concentrate their energies and resources on persuading the trial judge that their account of the facts is the correct one; requiring them to persuade three more judges at the

---

[13] NYR's work is shown on Column A, Item Nos. 70-82 on the Continuation Sheet of each requisition. (For example, see JA-1891, Defendant Exhibit 38AA.)

appellate level is requiring too much. As the Court has stated in a different context, the trial on the merits should be the main event rather than a tryout on the road. (Citation and quotation omitted.)

Anderson, 470 U.S. at 574-75.

E&T Skyline tries to frame this appeal as a matter of contract interpretation to avoid this deferential standard and seeks *de novo* review. The lower court, however, properly interpreted the contract documents, including the Performance Bond. Moreover, the lower court's findings of fact are not clearly erroneous, are amply supported by the Record, and should not be set aside.

Based on the exhibits admitted into evidence, the deposition testimony designated and admitted into evidence, the trial testimony and, most significantly, the lower court's assessment of the witnesses' demeanor and credibility, as well as the lower court's application of the governing law to the facts, Talisman respectfully submits that the decision and Judgment here should be affirmed in all respects.

## IX.
## <u>CONCLUSION</u>

For the foregoing reasons, the decision and Judgment of the United States District Court for the Southern District of New York (Rakoff, J.), entered on November 6, 2023, after a non-jury trial, should be affirmed, in all respects, with costs, disbursements and attorney's fees awarded to Talisman.

Dated: East Meadow, New York
         August 7, 2024

**TALISMAN CASUALTY INSURANCE COMPANY LLC**

s/Michael F. Kuzow

By:_____

Michael F. Kuzow

Michael F. Kuzow, Esq.
WESTERMANN SHEEHY
SAMAAN & GILLESPIE LLP
90 Merrick Avenue, Suite 802
East Meadow, New York 11554
(516) 794-7500

Counsel for defendant-appellee,
Talisman Casualty Insurance Company LLC

<u>**CERTIFCATE OF COMPLIANCE**</u>

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B), the word limit of Local Rule 32.1(a)(4)(A), because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 7,643 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

Dated: East Meadow, New York
   August 7, 2024

**TALISMAN CASUALTY INSURANCE COMPANY LLC**

s/Michael F. Kuzow

By:_____

Michael F. Kuzow

Michael F. Kuzow, Esq.
WESTERMANN SHEEHY
SAMAAN & GILLESPIE LLP
90 Merrick Avenue, Suite 802
East Meadow, New York 11554
(516) 794-7500

Counsel for defendant-appellee,
Talisman Casualty Insurance Company LLC